STATE *ex rel.* EVERETT RAY GILLESPIE,

*v.*

EARL G. KENDRICK, *Sheriff, etc., et al.*

(No. 14731)

Decided April 4, 1980.

*John R. Frazier* for relator.

*Chauncey H. Browning,* Attorney General, *Joseph C. Cometti,* Assistant Attorney General, for respondent.

HARSHBARGER, JUSTICE:

This original proceeding in prohibition and habeas corpus seeks Everett Ray Gillespie's immediate release from the Mercer County Jail and an order prohibiting that county's Circuit Court from adding thirty-two days to his sentence.

Gillespie pled guilty on November 21, 1978 to attempting to commit a felony. On November 30, 1978, he was sentenced to serve one year in the county jail to begin December 4, 1978. The sentencing order provided that he was to be released every Monday through Friday from 7:00 a.m. to 7:00 p.m. to work. He was employed by Dodson Brothers and regularly left the jail and returned to it each day during the period of his confinement. But in July, 1979, he was terminated by his original employer. He did not inform the jail and continued to leave during the allotted hours. He testified that he sought other employment and did at times work at odd jobs.

His work release privilege was revoked on October 9, 1979, when jail personnel learned that he was no longer employed by Dodson Brothers. A probation officer petitioned the trial court to extend Gillespie's term of confinement beyond December 3, 1979, to compensate for the time he spent out of jail on work release while not employed; and after a hearing the court ordered that he serve an additional thirty-two days.

Gillespie's petition alleges that he was entitled to good time credit under W.Va. Code, 7-8-11, which he was not granted by the sheriff, and such credit would be for a greater period of time than the extended sentence; that imposition of an additional thirty-two days to his sentence violated his double jeopardy rights; and that the circuit court had no authority to extend his sentence past December 3.

## I.

W.Va. Code, 7-8-11 [1963],[1] provides for deductions from sentences of prisoners in county jails for good conduct or

---

[1] Code, 7-8-11. Deduction from sentence for good conduct or donating blood.

Every prisoner sentenced to the county jail for a term exceeding six months who, in the judgment of the sheriff, shall faithfully comply with all rules and regulations of said county jail during his term of confinement shall be entitled to a deduction of five days from each month of his sentence.

donating blood. We have written several times on the state prison good time statute, but have never interpreted 7-8-11.

The county jail good time statute is mandatory. Every prisoner sentenced to six months or more "shall be entitled to a deduction of five days from each month of his sentence," if he complies with jail rules and regulations or donates blood. Code, 28-5-27 [1923],[2] was similar in construction and wording to the county jail statute when interpreted in *Woods v. Whyte*, ____ W.Va. ____, 247 S.E.2d 830 (1978):

> 1) *Law-Allowable Good Time—W.Va. Code*, 28-5-27 [1923]: This authorizes as much as 10 days per month for inmates who have not violated any prison rules in a given month.
>
> . . .
>
> II) *Expiration date*—The date an inmate will be released if he earns all of his law-allowable good time. An inmate with no infractions against him *will be released on this date by operation of law.*
>
> <em>Id.</em>, at 831 (Emphasis added).

---

In addition to the foregoing, every prisoner who desires to and does donate blood to any person, agency, organization, corporation or association as may be approved by the sheriff, shall be entitled to a deduction of five days from his sentence for each pint of blood so donated.

[2] Code, 28-5-27. Deduction from sentence for good conduct.

Every convict sentenced to the penitentiary for a definite term, and not for life, who shall faithfully comply with all the rules and regulations of the penitentiary during his term of confinement, shall be entitled to a deduction of his sentence as follows: Upon a sentence of one year, five days from each month; upon a sentence of more than one year, and less than three years, six days from each month; upon a sentence of not less than three years, and less than five years, seven days from each month; upon a sentence of not less than five years, and less than ten years, eight days from each month; upon a sentence of ten years or more, ten days from each month. When a prisoner has two or more sentences, the aggregate of his several sentences shall be the basis upon which his deduction shall be estimated.

*See also Watts v. Skeen,* 132 W.Va. 737, 54 S.E.2d 563 (1949) where the Court speaks about "entitlement to good time credit which has been earned"; and 46 Op.Att'y Gen. 159 (1955). The revised penitentiary good time statute, Code, 28-5-28 [1979], is also mandatory. *Woodring v. Whyte,* ___ W.Va. ___, 242 S.E.2d 238 (1978).

The good time credit law for federal prisoners, 18 U.S.C. § 4161,[3] follows the language of our county jail and former state penitentiary good time statutes and has been held to entitle prisoners to good time credit unless they have not faithfully observed all the rules. A federal district court stated in *Downes v. Norton,* 360 F. Supp. 1151 (D. Conn. 1973):

> In sharp contrast, 18 U.S.C. §4161, governing good time, provides that inmates *"shall be entitled"* to deductions from sentences when their conduct has been in keeping with the rules of the institution. Unlike parole, which an inmate may be unable to earn no matter how good his conduct . . . earned good time is much closer to the "conditional liberty" that *Morrissey* [v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)] held was entitled to procedural protection.
>
> *Id.,* at 1154.

We have consistently held that legislative use of "shall", means that that to which the word applies must be done, absent a showing of contrary intent. *Woodring, supra; Terry v. Sencindiver,* 153 W.Va. 651, 171 S.E.2d 480 (1969), Syllabus Point 2. Therefore, county jail prisoners have the statutory right to good time credit and it is mandatory that they be granted their credits if they

---

[3] 18 U.S.C. § 4161. Computation generally

Each prisoner convicted of an offense against the United States and confined in a penal or correctional institution for a definite term other than for life, whose record of conduct shows that he has faithfully observed all the rules and has not been subjected to punishment, shall be entitled to a deduction from the term of his sentence beginning with the day on which the sentence commences to run, as follows. . . .

"faithfully comply with all rules and regulations". Code 7-8-11.[4]

## II.

Mercer County's sheriff has not promulgated any rules or regulations governing conduct of inmates in his jail and the government argues that Gillespie is not entitled to good time credit because there were no rules for him to obey.

Good time credit is a valuable liberty interest protected by the due process clause. The Supreme Court elaborated in *Wolff v. McDonnell*, 418 U.S. 539, 557–58, 94 S.Ct. 2963, 2975–76, 41 L.Ed.2d 935 (1974):

> But the State having created the right to good time ... the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment "liberty" to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated....
>
> . . .
>
> We think a person's liberty is equally protected, even when the liberty itself is a statutory creation of the State. The touchstone of due process is protection of the individual against arbitrary action of government, *Dent v. West Virginia*, 129 U.S. 114, 123, 9 S.Ct. 231, 233, 32 L.Ed. 623 (1889).

In *Wolff*, *supra*, the Court established minimum due process standards which must be met before a state can revoke a prisoner's statutory right to good time. The Nebraska penal system, which was challenged in *Wolff*, had rules about standards of conduct for prisoners, and so the Court was not required to answer whether due

---

[4] In oral argument the Attorney General indicated that a quick survey of county jails revealed that about one-third of them were not granting prisoners any good time credit. Sheriffs cannot ignore this legislative mandate. We expect all sheriffs to immediately grant their prisoners the good time to which they are by this statute, entitled.

process requires the publication of rules and regulations.

Other courts have decided that written rules are a prerequisite to deprivation of rights based on failure to comply therewith. The opinions address both deprivation of good time credit and punishment such as segregation. Good time credit and freedom from additional confinement within jail are liberty interests to which due process considerations apply equally.

> Three procedural safeguards are constitutionally required by the Due Process Clause of the Fourteenth Amendment: 1. There must be rules and regulations officially promulgated by prison authorities and communicated to the prisoner apprising him of what conduct can subject him to serious discipline. . . .
>
> *Sinclair v. Henderson,*
> 331 F. Supp. 1123, 1129
> (E.D. La. 1971).

> . . . the present system still embodies the critical shortcoming that inadequate notice is given to inmates of what is expected of them. . . . Accordingly, we will order that the defendants adopt a comprehensive set of rules, submit them to us for our approval, and post them in locations to be approved by us, or otherwise make them fully available to all inmates.
>
> *Rhem v. McGrath,* 326
> F. Supp. 681, 692
> (S.D.N.Y. 1971).

This Court holds that in the prison context it is constitutionally required by the due process clause that the rules specifying prohibited conduct and the range of penalties for their infraction be written with reasonable specificity so that the inmate has fair warning to conform. Such fair warning requires that the rules must somehow be communicated to those so required to conform. Landman v. Royster, 333 F. Supp. 621, 654-656 (E.D. Va. 1971); Sinclair v. Henderson, 331 F. Supp. 1123, 1129 (E.D. La. 1971);

Rhem v. McGrath, 326 F. Supp. 681, 691 (S.D.N.Y. 1971). *See also* Colligan v. United States, 349 F. Supp. 1233 (E.D. Mich. 1972). This rule is, in addition to the constitutional mandate based on a conception of fundamental fairness, supported by the following considerations: first, prior notice of behavioral standards enhances the inmate's sense of fair play and thus contributes to rehabilitation; second, equal treatment of similar conduct of offending inmates by the prison authority will be more certain; third, clear rules may tend to decrease dissatisfaction with the disciplinary processes to such an extent that litigation may decrease; and fourth, since prison life is highly routine, it would not appear to be a heavy burden to require the prison authority to establish in advance reasonably clear rules. Notification of the inmates of the rules could be perfected by publishing the rules at several convenient locations in the prison to which the inmates have full access. *Sands v. Wainwright*, 357 F. Supp. 1062, 1090 (M.D. Fla. 1973), vacated and remanded to three judge court, 5 Cir., 491 F.2d 417, *cert. denied*, 416 U.S. 992, 94 S.Ct. 2403, 40 L. Ed. 2d 771

No federal prisoner will be placed in a segregation cell without compliance with the following minimum standard:

a. the rule or regulation allegedly violated must have been established in clear terms and reasonable notice of its existence must have been communicated to the federal prisoner population prior to the occurrence of the alleged violation. . . . *Johnson v. Lark*, 365 F. Supp. 289, 304 (E.D. Mo. 1973).

This court has no hesitation in holding that at least three procedural safeguards are constitutionally required by the Due Process Clause, viz:

(a) There must be rules and regulations officially promulgated by prison authorities and communicated to the prisoner apprising him of what conduct can subject him to serious discipline, what penalty he can expect and the procedure by which such determination will be made. *Gates and United States v. Collier*, 349 F. Supp. 881, 895 (N.D. Miss. 1972), *affirmed*, 5 Cir., 501 F.2d 1291.

7. The due process clause proscribes any serious disciplinary sanctions against an inmate unless he is found to have violated written rules which are adequately promulgated prior to the commission of the infraction charged and which describe punishable conduct with reasonable precision. (citations omitted). *Battle v. Anderson*, 376 F. Supp. 402, 421 (E.D. Okla. 1974).

In *Bones v. Warden, New York City Correctional Institution for Men*, 77 Misc.2d 617, 352 N.Y.S.2d 119 (Sup. Ct., Bronx County, 1974), Bones sought restoration of 85 days' good time credit.

The record shows many instances of failure to accord Petitioner due process. The most glaring example was the failure on the part of Respondent to provide Petitioner with published rules. . . . Therefore Petitioner was never informed of the acts which constitute disciplinary infractions and the penalties which may be imposed for said acts. . . . The failure to promulgate written rules and make them readily and easily available to the inmate population clearly constitutes a denial of minimal due process. (Rhem v. McGrath, 326 F. Supp. 681 (S.D.N.Y. 1971.)

Other jurisdictions have recognized this right to published rules which we hold is part of the notice phase of due process. . . . Notice does not only mean written notice of the charges (which

was not given here) but it encompasses prior notice of what acts are prohibited. *Id.,* 352 N.Y.S.2d at 120-121.

We agree with those courts that have held that minimum due process standards must be accorded prisoners with respect to their statutorily created good time credit rights. And the first requirement imposed on a government agency responsible for prisoners, by the federal constitution's Fourteenth Amendment and our state due process clause in W.Va. Const. art. III, §10 is publication of rules and regulations to apprise them of the conduct required for them to earn good time credits.[5]

The Supreme Court of Tennessee dealt with failure by officials to keep records on the conduct of inmates, where there was no legislative requirement that they do so:

> It is apparently true that the law has not placed upon any county official the duty of keeping a record of the conduct of workhouse prisoners. The workhouse commissioners and the superintendent, however, are required to keep other records . . . and an additional record as to the conduct of prisoners such as the defendant could easily be preserved under rules in force at the State prisons.

> In State ex rel. v. McClellan, 87 Tenn. 52, 9 S.W. 233, considering chapter 59 of the Acts of 1869–70 heretofore referred to, the court held where the superintendent of the penitentiary had neglected to keep a good time account of the prisoners, it would be conclusively presumed that the prisoner's conduct was unexceptionable [sic] and that he was entitled to full benefit of good time credits.

· · ·

---

[5] Included as an Appendix are excerpts from rules promulgated by the Cabell County Sheriff. They are an excellent example of jail regulations designed to protect both prisoners' and government interests.

There is certainly, however, nothing in this legislation to forbid the workhouse officials from keeping such a record. If no such record is kept, then we think under the authority of State ex rel. v. McClellan, supra, the conduct of prisoners sentenced to ... the workhouse should be presumed to be good.

> Gilliam v. State, 174
> Tenn. 388, 126 S.W.2d
> 305, 306-307 (1939).

This logic applies here. Although a sheriff is not statutorily required to keep records of conduct,[6] the absence of such records will work presumptively in a prisoner's favor. A county jail prisoner will be presumed to have conducted himself well and will be entitled to the good time credit established by Code, 7-8-11 unless he has a recorded history of misconduct.

## III.

Even if Gillespie were not entitled to his earned good time, the lengthened sentence violated his right to be free from multiple punishments for the same offense as guaranteed by the federal double jeopardy clause, U.S. Const. amend. V, made applicable to the states by the Fourteenth Amendment, and the state double jeopardy clause, W.Va. Const. art. III, §5. We wrote about a similar double jeopardy claim in Conner v. Griffith, ____ W.Va. ____, 238 S.E.2d 529 (1977), involving multiple punishments.

Code, 62-11A-1, provides in relevant part:

(1) When a defendant is sentenced or committed for a term of one year or less by a court of record having criminal jurisdiction, such court may in its order grant to such defendant the privilege of leaving the jail during necessary and reasonable hours for any of the following purposes:

---

[6] Code, 7-8-2a requires the county to keep daily records showing the total number of prisoners confined, the number of prisoners admitted, the number released, the cost per capita of feeding and care of prisoners in each calendar month and a daily record of food served to prisoners.

(a) To work at his employment;

(b) To seek employment;

. . .

(f) To devote time to any other purpose approved by the court.

(2) Whenever an inmate who has been granted the privilege of leaving the jail under this section is not engaged in the activity for which such leave is granted, he shall be confined in jail.

. . .

(7) The court shall not make an order granting the privilege of leaving the institution under this section unless it is satisfied that there are adequate facilities for the administration of such privilege in the jail or other institution in which the defendant will be confined.

The state contends that after Gillespie's dismissal from employment in July, the time he spent out of the jail was equivalent to an escape. As an escapee, the state continues, he was not "in custody", did not serve his sentence, and the additional thirty-two day sentence was not a multiple punishment.

This position is contrary to *Conner*:

Time spent serving a sentence does not depend on the manner or location in which it is served. There are, to be sure, different degrees of confinement recognized in any penal system. The fact that some confinements are less restrictive than others should have no bearing in computing the time served on the sentence.

*Conner, supra* at 534.

Gillespie was certainly more restricted on the work-release privilege than he would have been on parole. If time served on parole is to be considered against a sentence, time spent in a work release program should be treated in the same fashion. *Conner, supra*. The statute governing violation of parole, W.Va. Code, 62-12-9, like the one governing work release, W.Va. Code, 62-11A-1, no where authorizes the court to impose an additional sentence for its violation. Both statutes provide that a vio-

lation will result in a return to confinement.[7] The failure of Mercer County officials to detect Gillespie's work release violation does not subject him to alternative remedies which are not provided by statute.

A trial court has a statutory duty, W.Va. Code, 62-11A-1(7) not to grant work release privileges unless adequate arrangements are made for their implementation and administration. The following colloquy in the deposition by Sheriff Kendrick indicates that the court did not follow the statute:

> Q: "Sheriff, in addition to that individual card, I think you had mentioned earlier that there was a daily record sheet that would reflect, perhaps, that Mr. Gillespie and anyone else in the work release program was signing out and signing in on a daily basis."
>
> A: "He's in the records as being a prisoner. To go into a detailed thing about what he did that day, and so on and so forth, we don't have that. It's just a matter of fact that he is still a prisoner in the Mercer County Jail."
>
> Q: "Like you would have on any other prisoner in the Mercer County Jail."
>
> A: "That's right."
>
> Q: "So in effect there was no formal written program, whereby he would sign out each day and sign back in each evening."
>
> A: "No."
>
> Q: "Apparently there was no follow-up by the Judge's office or by your office, to confirm that he was actually working for a certain employer."
>
> A: "The way this record is kept, it's by the very fact that the man on duty knows that he's supposed to come in. If he comes in, then he's there. If he doesn't come in, it's noted that he is not there. And that's the record.

---

[7] Code, 62-11A-1(2), *supra.*

If he would not show up for a night, we would know he did not show up, and the record would show he didn't show up, and we'd be looking for him."

. . .

Q: "To your knowledge, did you or any member of your staff, or the Judge or any member of his staff, follow up and talk with these employers?"

A: "Yes, sir".

. . .

Q: "What was the procedure or policy? Was that done every week, every month, or what was the policy on that?"

A: "No policy. The very fact that the man was keeping irregular work hours led my man on duty to the very thought that there was something wrong. This man called the employer to see if this particular person . . . was actually working the hours that he said he was working. . . .

Forfeiture of time spent on work release by imposition of an additional thirty-two day sentence has the direct effect of increasing the time a prisoner must serve on his underlying sentence. It constitutes multiple punishment for the same offense and violates the Double Jeopardy Clause of the W.Va. Const. art. III, §5. *Conner, supra.*

Gillespie is entitled to immediate release because he has served his full sentence.

*Writs granted.*

### APPENDIX

### MANUAL OF RULES AND REGULATIONS AND GENERAL POLICY GOVERNING INMATES AND/OR PERSONNEL CABELL COUNTY JAIL

I. INMATE RULES

A. All inmates must conduct themselves with decency and in an orderly manner.

B. All inmates shall refrain from the use of profanity, loud whistling, singing or yelling from one part of the jail to another or any indecent conduct.

C. An inmate shall not be permitted to have more than five dollars ($5) in their possession. All property will be returned to the prisoner at the time of his release.

D. No inmate shall engage in gambling in any manner.

E. All inmates are required to bathe with soap and hot water at least once a day.

F. Inmates, both sentenced and unsentenced, are required to keep their cells clean. This includes sweeping and mopping the floors, cleaning the walls, wiping the bars, both the cell area and those along the guard walk, cleaning the toilets and basins.

G. An inmate shall not remove blankets, pillows, sheets or mattresses from the cell area. Nor shall same be placed on the floor or in front of the cell.

H. Inmates shall not be permitted to keep any articles whatsoever under their mattresses. This is to prevent the accumulation of dirt and vermin. Articles such as letters, books, etc. will be kept neatly in a box under the bunk.

I. An inmate caught trying to smuggle into the jail any firearms, files, saws, narcotics or any other contraband will be punished and may be liable to an additional term of imprisonment.

J. Kangaroo Courts are forbidden. Any inmate found to be a member of such an organization will be punished. Prisoners will not be allowed to impose punishment upon each other.

K. An inmate caught destroying jail property (state, county, city) will be charged and may be subject to additional sentencing.

L. An inmate shall at no time speak to a jailer in a disrespectful tone or curse any jailer.

M. Packages with clean clothing may be mailed or left at the jail at any time.

N. Inmates are allowed to have a small transistor radio with an earplug. This earplug is to be used so as not to disturb other inmates in the cell or in other cells throughout the jail. Stereos are forbidden.

O. Inmates may have in cell areas newspapers or magazines. However, an inmate shall not place same over cell area or walls.

P. An inmate shall not draw and/or post graffiti on walls of cell or jail.

## II. GUIDELINES FOR INMATE DISCIPLINE

A. *Purpose*—A well-disciplined institution facilitates correctional objectives, permits individuals to live in harmony with one another and allows them to concentrate on self-improvement rather than self-protection.

To improve a safe and constructive prison community, its residents are expected to behave in a manner consistent with the welfare of others and within the general security guidelines set forth by the administrator.

B. *Policy*—When an inmate's behavior endangers or threatens to endanger the welfare of others or himself or is contrary to the security of the institution, he is subject to being disciplined for his misbehavior. Any of the following enumerated categories and topics of offenses will subject an inmate to disciplinary action.

| OFFENSE | MINIMUM PUNISHMENT | MAXIMUM PUNISHMENT |
|---|---|---|
| *Category 1* | | |
| 1. Possession of a weapon or sharpened instrument | 5 | 8 |
| 2. Inciting a riot and rioting | 5 | 8 |
| 3. Attempting escape, tampering with locks, etc. | 5 | 8 |
| 4. Interferring with an employee in the performance of his duties | 5 | 8 |
| 5. Setting a fire | 5 | 8 |
| 6. Assaulting employee or inmate | 5 | 8 |
| *Category 2* | | |
| 1. Refusing to obey a direct order | 4 | 7 |
| 2. Making forcible homosexual advances to another | 4 | 7 |
| 3. Destruction of property (state, local) | 4 | 7 |
| 4. Operating a gambling pool | 4 | 7 |
| 5. Possession of custodial uniform or parts thereof | 4 | 7 |
| 6. Under influence of drugs, intoxicants or possession | 4 | 7 |
| *Category 3* | | |
| 1. Fighting or assaulting another inmate | 3 | 6 |
| 2. Threatening bodily harm | 3 | 6 |
| 3. Refusing to help keep cells clean | 3 | 6 |
| 4. Homosexual behavior | 3 | 6 |
| 5. Repeated or habitual minor violations of institutional rules | 3 | 6 |
| *Category 4* | | |
| 1. Stealing | 2 | 5 |
| 2. Abusive or vulgar language | 2 | 5 |
| 3. Possession of contraband | 2 | 5 |
| 4. Disruptive behavior | 2 | 5 |

|  | MINIMUM PUNISHMENT | MAXIMUM PUNISHMENT |
|---|---|---|

*Category 5*

1. Unauthorized possession of more than $5.     1     4
2. Untidy or unsanitary condition person or quarters, not conforming to posted requirements concerning personal appearance     1     4
3. Attempting or making unauthorized contacts with public     1     4
4. Unauthorized mail or telephone use     1     4
5. Gambling     1     4

    C. Minimum and maximum penalties which may be imposed by the adjustment committee (In order of severity).

      1. Reprimand, the fact of which will be recorded.

      2. Loss of privileges including loss of canteen, recreational, television and all of this for a maximum of thirty (30) days.

      3. Cell restriction or quarters' restriction for a maximum of ten (10) days for each offense.

      4. Cell restriction or quarters' restriction for a period of 11 to 30 days for each offense.

      5. Isolation for a maximum of 15 days for each offense.

      6. Loss of Good Conduct time, 1 to 30 days and isolation for a maximum of 15 days for each offense.

      7. Loss of Good Conduct time 31 to 50 days.

      8. Loss of Good Conduct time 60 days total accumulated number of days isolation for a maximum of 15 days for each offense.

NOTE: Good conduct time taken as described above may be restored by the Sheriff of the Institution upon a showing of good cause.

The objective for imposing penalties are to provide controls necessary to maintain a reasonable safe prison community for inmates welfare and the welfare of others and to inculcate in the inmate voluntary acceptance of behavioral limitations.

Employing penalties appropriately is the most important task involved in maintaining a constructive climate within the institution. There are no magic formula for maintaining a wholesome prison climate but we shall be committed to the following principles that shall be adhered to in this institution.

1. Penalties shall not be capricious or imposed in the nature of retaliation or revenge.
2. Penalties are imposed in an impartial and consistent manner, but not necessarily in a uniform manner.
3. Penalties are imposed only at such times and in such degree as is necessary to regulate the inmates behavior.
4. Corporal punishment (punishment applied to the body of the offender) is strictly prohibited.

D. *Principles*—Administration of discipline—The Sheriff or Director of this institution is responsible for the guidance and direction of institutional staff in the handling of disciplinary matters. In administering disciplinary policy at the institutional level, the following guidelines are employed.

E. *Adjustment Committee*—This institution will establish a committee known as the Adjustment Committee, composed of no less than one nor more than five disinterested members to administer discipline. A member of the staff bringing charges against an inmate shall not act as a member of the committee, hearing that particular case. Therefore, in any individ-

ual case, the member of the staff who charged an inmate with misbehavior will not sit in judgment of that inmate. The Committee will settle each case only on the basis of the evidence presented at the hearing and an inmates prior disciplinary record if any will not be introduced or considered in determining the inmate's guilt or innocence.

F. *Report of Misconduct*—Misbehavior will be promptly reported to the supervising officer. A misconduct report will be initiated and will include the specific rule violated and the fact surrounding the same. The report should be typewritten and a copy will be given to the inmate as soon as practical after preparation.

G. *Minor Misconduct*—The officer in charge of the shift may impose a minor penalty (reprimand or warning or loss of privilege, cell restriction or other similar punishments). A misconduct report will be completed by the officer in charge which will include the specific rule violation. The exact penalty being imposed and its duration, a copy of the written report will be given to the inmate. The inmate is advised that he may appeal the officer's decision to the Adjustment Committee. In case of apeal, the matter is handled as described under paragraph "II" below.

H. *Major Misconduct*—If the case is referred to the Adjustment Committee, the inmate may be placed in detention when the officer considers his behavior to be dangerous to persons or property for a period of not more than two (2) working days, until he appears before the committee. The hearing should take place within two (2) working days after report of the infraction. Prior to the hearing, the inmate may request assistance to help him present the case. The inmate may have the assistance of a coun-

selor/advisor and an opportunity to prepare before the hearing. Counselors could be drawn from the following:

a. The lay staff of the jail (teachers, doctors, etc.)
b. Lawyers or law students
c. Fellow prisoners
d. Community volunteers

1. The conduct of the hearing will be orderly but informal. The inmate may offer the testimony of voluntary witnesses in his behalf. The offender will be expected to present his version of the alleged offense and admit or deny the truth of the charges. The orderly cross-questioning of witnesses and the appropriate witnesses will be permitted. However, the committee has the discretion to limit repetitive or irrelevant testimony. A written finding, called the Disciplinary Report, will be made and a copy will be furnished the prisoner when punitive segregation or loss of Good Conduct time is imposed.
2. Inmate allowed to notify if the principles outlined in this policy are followed there is reason to expect that the inmate will recognize that he has been treated fairly. The inmate can appeal to the Sheriff for review all decisions reviewed by Director.
3. A copy of all disciplinary reports, hearings and disposition may be forwarded to the Sheriff or director of the institution for his review and approval and maintained in the inmates file at the institution. Should the Sheriff or director, after the said review, decrease the punishment called for by the Adjustment Committee, the reason therefore will set forth in a brief statement and a copy will be furnished the prisoner. Punish-

ments shall not be increased by the Sheriff or Director.

I. *Penalties*—In imposing penalties emphasizes the treatment and correction of the offender, rather than an arbitrary response to the offense. Therefore, a wide range of penalties is employed consistent with the needs of the offender rather than uniform application with respect to the offense.

1. For minor misconduct penalties may involve warning reprimand, restriction of privileges and other similar type punishment, each for a maximum period of ten (10) days.

2. For more serious offenses or repeated minor offenses, penalties may include, but not limited to, placement in an isolation unit, loss of Good Conduct time, recommendation not to award good conduct time, recommendation for a transfer to a more secure setting.

3. If after a hearing the evidence against the prisoner and before hearing the accused inmate, a majority of the members of the Adjustment Committee are of the opinion that a violation of the Criminal Code of the State of West Virginia has occurred, then a warrant will be secured as soon as possible. The Adjustment Committee shall immediately adjourn and its chairman shall forthwith recommend prosecution to the Sheriff of the institution involved.

4. In the latter event the Adjustment Committee will reconvene as soon as it is practical to do so and proceed to determine the merits of the offense charged. However, if the State of West Virginia does prosecute the inmate, the violation will not be heard by the Adjustment Committee but he may be re-classified by regular procedures.

5. The primary value of isolation is to exert immediate control over the unruly inmate or to restrict the activities and social opportunities of those exhibiting serious misconduct. It is not intended and not to be used as a means of physical punishment. When used discreetly and sparingly, it may be an effective technique. When over-used, the effectiveness is diluted and the technique becomes a crutch to the staff and to the inmate many of whom accommodate rather easily to isolated living.

6. Occasionally, a prisoner will ask to be confined in isolation or segregation. Such request must be submitted in writing to the Sheriff or Director of the institution for approval. Such request should also state the inmates reason for wanting to be placed in isolation, and should be signed and dated by the inmate. Also, when an inmate requests to be placed in isolation, he will receive only those privileges afforded to inmates placed in isolation. Therefore, the following standards will also apply to inmates who request to be placed in isolation.

J. *Standards for Isolation*

1. Physical Condition—Isolation cells or units will be well-ventilated, adequately lighted appropriately heated and maintained in a sanitary condition at all times.

2. Number of Occupants—Except in emergencies, the number of inmates confined to each cell or room shall not exceed the number for which it is designed. Should an emergency create an excess in occupancy, the Sheriff of the institution will provide temporary approval and immediately proceed to alleviate the situation as promptly as possible and make other arrangements for the inmates so confined.

3. Clothing and Bedding—Inmates in isolation will ordinarily dress in normal institutional clothing if provided. If not provided, regular street clothing will be worn. The inmate shall be furnished a mattress and bedding. Should an inmate exhibit destructive behavior while in isolation, particularly self-destruction behavior, his personal and bed clothing and all furnishings may be removed to assure his safety. However, the removal of such items will be done only under the direction of the supervisory officer and will be reported to the appropriate medical officer.

4. Food—Inmates assigned to isolation will receive the standard rations and the menu of the day. In no event will the inmate or inmates be deprived of their necessary daily minimum requirements of caloric content.

5. Visiting—Individuals confined to isolation may not, without the approval of the Sheriff or Director, receive visits from family, relatives or friends. They may receive visits from attorney for the purpose of conducting legal business.

6. Duration of Isolation—The inmate will remain in isolation for a determined or an undetermined period of time, but not longer than fifteen (15) days. Infractions of rules by a prisoner while in isolation or continued defiance of institutional authorities, will be referred to the Adjustment Committee under the above established procedures for a hearing, except in the event of exceptional circumstances. The prisoner may be kept in isolation for an additional period of up to fifteen days for each such additional infraction and hearing; but a special report shall be made to the Sheriff or Director whenever such offenses, while in confinement, take

place. If return to the regular population after fifteen days represents a threat to the population or to the security of the institution, the inmate should be referred to the Adjustment Committee for their recommendation as to transfer to a different setting.

K. *Segregation*—Isolation, as described above, is intended as punishment designed to be corrective in nature. Segregation, on the other hand, is not regarded as a means of punishment. It is a means of incapacitation or preventive control. An individual inmate may be so seriously disturbed, emotionally or mentally, that he cannot safely function in the regular inmate population. Such individuals, if not committed to a mental facility, will be maintained in this status under medical direction.

III. HOUSING

A. Juveniles should be housed separately from adults within the institution. To the degree possible, young adults should be separated from older adults and misdemeanants from felons and federals from all, where possible.

B. Pretrial detainees should be housed separately from inmates who have been sentenced whenever possible.

C. Men and women shall be housed separately.

D. Inmates who are vulnerable to attack, physically and sexually, should be insured all possible protection. Whenever possible, we will seek to establish separate cells or facilities for inmates with major medical problems.

E. Where inmates are separated for their own protection, privileges which otherwise would have been available to them, shall not be denied.

## IV. PROGRAMS

This facility will encourage Vocational Education and Counseling (Alcoholic and Narcotic) Programs available to inmates who would like to take part in them. Both pre-release and work release programs shall be encouraged.

## V. ATTORNEY VISITS

A. Attorneys will be given access to visits with their clients during regular business hours and other reasonable hours, nights and weekend visits should be permitted where practical and possible.

B. Conversations with attorneys are confidential and jail personnel may not listen to them.

## VI. VISITATION

A. This facility shall designate hours, at reasonable times, when prisoners may have visitors. The establishment of daily visiting hours will be fixed and posted by the Sheriff.

B. All visitors must register and may be searched.

C. All inmates shall have the right to confidential visits with the following persons:

1. His attorney (or authorized members of his staff), probation or parole officer or authorized social worker.
2. Any minister, priest, rabbi, doctor, psychiatrist or practicing psychologist.

## VII. TELEPHONE CALLS

A. When a prisoner arrives at the jail, he/she will be allowed to make at least one completed phone call to the intended party to notify friends or relatives, attorney or bondsman. Local calls will be free and long distance calls will be reversed.

B. This facility shall make provisions for a reasonable number of weekly calls and may impose reasonable restrictions on the length and number of all telephone calls. Messages from attorneys to inmates asking that calls be returned will be delivered, where possible.

VIII. CORRESPONDENCE (Mail)

A. There shall be no limit on the number of letters an inmate may receive or send. There are no limits as to the people he/she may send mail to or receive mail from.

B. All inmates, regardless of their jail status, shall be afforded the same correspondence privileges.

C. Correspondence privileges shall not be withdrawn as punishment unless the offense relates directly to abuse of these privileges.

D. No letter shall be intentionally delayed in mailing or delivery. Mail that has been delivered for an inmate who has been transferred shall be forwarded.

E. An inmate will not be required to sign a waiver consenting to censorship.

F. All letters to and from the following categories will not be read and may be inspected in the inmates presence.

1. attorneys
2. Federal and State elected or Law Enforcement Officials
3. Court Officials
4. Officials of Division of Corrections and Department of Welfare,
5. ACLU, NAACP and such other established social action organizations as may be designated by this institution.

All mail sent out by an inmate will be sealed by the inmate. Incoming mail may be opened

and examined for contraband in the inmates presence, but the letters will not be read or censored.

G. Certified checks or mail money orders will be accepted as money or cash for inmates. Cash will be accepted only if paid in person at the jail. Receipts will be given for all monies accepted.

H. All inmates may send or receive packages regardless of their status, except where such privileges have been taken away by disciplinary action. All packages will be searched for contraband in the inmates presence. This institution will establish reasonable regulations as to items which may be received.

I. Inmates may subscribe to or receive through the mail any newspaper or magazine or book with the exception of publications which violate United States Postal Regulations, of which advocate the violent overthrow of the Government of the United States or which advocates violence or rebellion against government authority under which the inmate is held.

J. Inmates may receive and send registered mail.

K. Notary services shall be provided for all inmates. Material for notarization are not to be read.

IX. LIBRARY

A. All inmates shall have access to any existing library facilities.

B. This facility has worked out a lending system with the local library in order that books may be available.

X. LEGAL MATERIALS, BOOKS

A. Every inmate shall be allowed to prepare his own legal documents.

B. Inmates may purchase or receive legal materials by mail.

## XI. PERSONAL PROPERTY AND MONEY

A. On admittance, an inmate must turn over to the jail officials all personal property other than the items specifically listed below. Inmates may retain in their possession:

1. writing instruments, except where they constitute a possible danger.
2. addresses and telephone numbers
3. eyeglasses, hearing aides
4. personal legal materials, such as those papers in his possession or served afterwards and reasonable amounts of reference legal materials, books, magazines, newspapers and other items sold on commissary.
5. photographs and other items which are not required to be turned in at receiving. An accurate account shall be kept of each prisoners funds. An inmate is entitled to spend such funds on canteen, postage, etc. The amount expended and the balance shall be recorded and reported at inmates request.

B. The inmates property will be returned to him upon his release. If an inmate is transferred to another institution, his money and personal property will be forwarded to him.

C. Medicines or prescriptions will be kept in the infirmary and will be dispensed by the LPN or paramedic as the inmate needs it when prescribed by physician on call at the jail or the inmates personal physician (at his expense).

## XII. MEDICAL AND DENTAL CARE

A. There shall be a physician on call at all times and an LPN or paramedic on duty when possible. If a physician or dentist is not on call in the event of a medical emergency involving an

inmate, a physician or dentist will be called immediately or the inmate will be transported immediately to the nearest available medical facility depending on circumstances.

B. At no time shall jail personnel diagnose ailments, prescribe medication or administer injections.

C. A person shall not be admitted to this facility with obvious physical injury or who is not fully conscious. He shall receive immediate medical attention from a licensed physician.

D. An inmate who complains of a medical illness may call a licensed physician of his own choice as it is understood by both the inmate and the physician that the inmate is responsible for the cost of such medical care or treatment.

## XIII. PERSONAL HYGIENE

A. On admission, each inmate will be given bedding, toilet paper, towels and other necessities. No inmate shall be held in any cell where there is not a sink, commode, bunk and mattress, except where he/she is likely to use such items in such a way as to pose a substantial danger to himself or property.

B. Clean linen and towels will be supplied at least once a week.

C. Sanitation equipment will be made available daily to each inmate who shall keep the cell area clean.

D. All common rooms, toilets, sinks and cells used by the inmate shall be cleaned daily by the inmates.

E. Extermination will be done as often as necessary to keep the jail reasonably free of pest, vermin, lice, bugs, etc.

F. Each inmate may be allowed to shower and shave daily and must shower at least twice a week.

## XIV. RECREATION

A. All jails are encouraged to provide indoor recreation and outdoor exercise. Any person held more than thirty (30) days shall be afforded regular physical exercise or activity.

B. Inmates shall be allowed to have radios and should be allowed to play them as long as they do not disturb others.

C. Television is made available to inmates in the dining room area where funds are available.

## XV. RELIGIOUS SERVICES

A. Religious services are provided periodically. An inmate may attend religious services of his/her choice during scheduled hours. An inmate may not be required to attend such services, however.

B. An inmate may request to see a chaplain by asking the inspecting deputy to arrange the visit.

C. Inmates whose faith requires a special diet will be afforded the same whenever possible and when properly notified.

## XVI. DUE PROCESS PROCEDURE

A. Disciplinary Hearing Procedure

1. Disciplinary hearings before an impartial officer or panel where available, shall be conducted before any sentence of punitive segregation may be imposed or good time taken. Inmates reasonably believed to be dangerous may be segregated prior to the hearings.

2. The inmate shall be given advance written notice of the charges against him, which shall include the following:

   a. the name of the officer or employee who observed and reported the violation. (This officer may not serve on the panel deciding the case).
   b. specific rule violation
   c. time, date and place of violation.

3. The inmate has the right to be present at the hearing.

4. The hearing shall be informal but each side shall have the right to present witnesses in his own behalf and to question opposing witnesses.

5. The inmate may have the assistance of a counselor, advisor and an opportunity to prepare before the hearing. Counselors could be drawn from the following:

   a. the lay staff of the jail (teachers, physicians, etc.)
   b. lawyers or law students
   c. fellow prisoners
   d. community volunteers

6. Where punitive segregation or loss of good time is imposed, written findings or fact shall be made and supplied to the inmate. They shall include the specific disciplinary action to be taken, including time limits on punishment.

7. The inmate may submit his case for review to the Sheriff or chief official may review the record and decide, suspend or reduce the sentence. He may never unilaterally increase the punishment.

## CONDITIONS AND LIMITS ON PUNISHMENT

A. Correspondence privileges may never be denied as punishment unless the offense itself relates to abuse of such privileges.

B. Bread and water or any other dietary restrictions may not be imposed as punishment.

C. Physical restraints (chains, tape, handcuffs, etc.) may not be used to bind an inmate except for transport or where prescribed by a competent physician for the inmates safety.

D. Corporal punishment may never be used.

E. Inmates may not be denied bedding, clothing, or toilet articles as punishment nor may they be so restrained as to prevent exercise.

F. There must be a time limit on every punishment.

G. An inmate shall never be punishment for his/her political belieff, the books which are read or the organizations to which they belong.

H. Tear gas, chemical mace or similar instruments may not be used, except where physical injury to person or property is imminent and reasonable otherwise unavoidable.

I. An inmate may not be held in punitive segregation for more than fifteen (15) consecutive days for any one offense.

Approved by,

(s) Ted T. Barr

Ted T. Barr, Sheriff
21 December 1978