356 S.E.2d 457

**FACILITY REVIEW PANEL, et al.**

v.

**William D. HOLDEN, Sheriff, etc., et al.**

**No. 17240.**

Supreme Court of Appeals of
West Virginia.

April 9, 1987.

Mary Downey, Juvenile Justice Comm., Charleston, for appellant.

Lucian R. Sammons, Jr., Pros. Atty., West Union, for appellee.

PER CURIAM:

This original proceeding in mandamus was brought by the Facility Review Panel on behalf of inmates of the Doddridge County Jail, seeking closure of the jail until conditions meet minimal constitutional and statutory standards. The respondents are the sheriff and members of the County Commission of Doddridge County who are statutorily charged with the duty to provide a jail meeting those standards. We issued a rule against the respondents ordering them to appear and show cause why a writ of mandamus directing them to cure deficiencies in the jail should not be awarded.

This is another case in the seemingly steady stream of "penal conditions" cases where the courts are required to mandate that the parties responsible for operating our prisons and jails comply with the United States and West Virginia Constitutions and state law. The standards required have been carefully detailed in previous decisions of the United States District Court for Southern West Virginia in *Dawson v. Kendrick*, 527 F.Supp. 1252 (S.D.W.Va.1981) and this Court in *Crain v. Bordenkircher*, 176 W.Va. 338, 342 S.E.2d 422 (1986) and *Hickson v. Kellison*, 170 W.Va. 732, 296 S.E.2d 855 (1982). Thus, the legal framework for resolving this case is clear.

Respondents appeared and answered the petition by listing certain steps currently being taken to remedy some of the jail conditions cited by relator, as well as plans for future improvements. Respondents did not contest any of the relator's factual representations concerning conditions in the jail. There being no factual dispute, we are solely concerned with deciding whether the conditions violate federal and state constitutional standards or applicable statutory requirements.

The Fourteenth Amendment to the United States Constitution extends to the states the Eighth Amendment prohibition against cruel and unusual punishment for inmates who are serving a sentence and similar protection under the Due Process Clause of the Fifth Amendment for pre-trial detainees.[1]

---

1. *Hickson, supra* at 856 provides as follows:
   Despite this difference in the particular constitutional right afforded between the sentenced inmate and the pretrial detainee, it does not appear from a practical standpoint that the end result differs substantially. Where conditions of confinement are at issue, it would seem of little moment as to how the inmate's confinement has occurred.

The court in *Dawson, supra,* provided a comprehensive critique of conditions at the Mercer County Jail and ordered detailed changes in each area of deficiency. Using the "totality of conditions" analysis, the court reviewed specific violations in the context of an overall jail facility and program which could only be described as "substandard" and "debilitating." [2] The "totality of conditions" review "requires that each thread in the fabric of challenged conditions be isolated, yet judged with an appreciation of its interdependent existence." *Dawson, supra* at 1285.

■ "A jail is evaluated by a 'totality of circumstances' test to determine if incarceration in that jail is cruel and unusual punishment." Syl. pt. 3, *State ex rel. Harper v. Zegeer,* 170 W.Va. 743, 296 S.E.2d 873 (1982).

■ "Certain conditions of ... confinement may be so lacking in the area of adequate food, clothing, shelter, sanitation, medical care and personal safety as to constitute cruel and unusual punishment under the Eighth Amendment to the United States Constitution and Article III, Section 5 of the West Virginia Constitution." Syl. pt. 2, *Crain v. Bordenkircher,* 176 W.Va. 338, 342 S.E.2d 422 (1986).

After reviewing circumstances at the Pocahontas County Jail under the "totality of conditions" analysis, we held in *Hickson, supra,* that the deficiencies constituted such cruel and unusual punishment, and likewise violated certain minimum statutory provisions for county jails.[3] "Although neither the Eighth Amendment of the United States Constitution nor Article III, Section 5 of the West Virginia Constitution defines acceptable living standards for prison inmates, we must be guided ... by prevailing standards of decency to de-

termine how the State must treat its criminals." *Crain, supra* 176 W.Va. at 352, 342 S.E.2d at 437.

■ In the case before us, relator presents a panoply of violations that significantly affect the overall health and safety of inmates at the jail. We find that the great number and severity of the deficiencies require a comprehensive program of improvements and not simply a limited review which might be more appropriate in a facility with generally acceptable conditions.[4] The uncontroverted conditions in the Doddridge County Jail, when reviewed under the totality of conditions analysis, violate the prohibition against cruel and unusual punishment of both the Eighth Amendment and Article III, Section 5 of the West Virginia Constitution.

"Independent of any constitutional considerations there are statutory provisions in our State which reflect a legislative mandate that county jails be operated at certain minimal standards." Syl. pt. 3, *Hickson, supra.* The statutes applicable to the substandard conditions conceded by the respondents will be cited below in our discussion of the specific circumstances at the jail.

## CONDITIONS AT THE JAIL

1. *Fire Safety:*

The jail has no written evacuation plan for fire or other emergencies, no fire drills, no sprinkler system, and at least one dysfunctional fire alarm. Both doors to the outside staircases are padlocked from the outside. These are the only alternate exits for inmates who are all confined on the second floor. The time needed to reach inmates in the event of an emergency constitutes a clear danger to the inmates' health and welfare.

2. In *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the United States Supreme Court reviewed certain conditions at a short-term custodial facility under the more limited "discrete adjudication analysis" against the backdrop of a modern center which "represented the architectural embodiment of the best and most progressive penological planning" with inmates being housed in residential units and not barred cell blocks.

3. The parties filed a plan of implementation with this Court on March 18, 1983, setting forth in detail the corrective action agreed upon in light of the opinion in *Hickson.*

4. *See* n. 2, *supra.*

*W. Va. Code,* 7–1–5 [1980] provides in relevant part that "[i]t shall be the duty of the county commissioners ... to provide for and have general supervision over the repair and maintenance of the county courthouses, jails...."

*W. Va. Code,* 7–3–2 [1980] provides in relevant part, "[t]he county commission shall keep the courthouse, jail and other offices in constant and adequate repair...." Finally, *W. Va. Code,* 7–8–2 [1985], in relevant part, requires the sheriff to "keep the jail in a clean, sanitary and healthful condition."

■ The inadequate fire detection and evacuation system constitutes a violation of the respondents' statutory duties and a constant and unnecessary threat to the lives and safety of the inmates. In their answer, respondents state only that they are now "considering" the alternative of an electronic door device to replace the padlocked exits but fail to specify any immediate measures that will be taken to alleviate the unsafe conditions. Given the urgency and magnitude of this problem, we find this response to be inadequate.

2. *Safety and Security:*

The only jail staff are the sheriff, his wife, who prepares the inmates' meals, and a law enforcement deputy who provides back-up assistance. Their duties are all performed on the first floor or outside the jail. No scheduled observations of the inmates on the second floor occur except at mealtimes. Inmates are otherwise left alone to deal with emergencies such as potential suicides, assaults, fire and medical requests. With no electronic or other communication system in the jail, inmates can only contact the staff by shouting, stamping or rattling bars.

Twenty-four hour supervision of inmates, including regular direct observation, is impossible given the limited staff, and therefore assistance to the inmates is irregular

and inadequate. If all three staff members are out of the jail, or do not hear or respond promptly to a banging signal from the cells, serious harm or injury to inmates could easily occur.

In *Dawson,* the court ruled that "the failure to provide staff of adequate number and training results in an unconstitutional risk of harm to the prisoners." *Dawson, supra* at 1293. We hold that the inadequate staffing constitutes one thread in the cloth under our totality analysis which as a whole renders the conditions unconstitutional and in violation of respondent's statutory duty to provide a safe and healthful jail.[5]

Respondents state that they are "in the process" of "seeking approval" of a camera and intercom system in place of hiring additional staff for daytime cell supervision as requested by relators. It is unclear from whom they are seeking such approval since the sheriff has the duty to operate the jail and the county commission to finance its operation. While acknowledging the lack of supervision, respondents have not agreed to provide 24–hour supervision of inmates with direct surveillance at reasonable intervals around the clock.[6]

3. *Medical Care:*

At the Doddridge County Jail, inmates are not medically screened upon admission, no medical records are kept, and no regular sick call is held. Medical care is provided by taking inmates to the emergency room of a local medical center when such care is deemed necessary by overworked and untrained jail staff. As relators note, the jail population generally includes high risk individuals who often are in need of psychological or psychiatric services, such as potential suicide diagnosis and prevention, drug and alcohol treatment and counseling.

The court in *Dawson* held that: "[D]enial of adequate medical screening, classification, record keeping, sick call procedures

---

5. *W. Va. Code,* 7–3–2 and 7–8–2, as amended, *supra.*

6. In *Dawson, supra,* the defendant sheriff jailer and county commission were ordered to in-

crease staffing to provide at least one deputy on each floor where inmates were housed 24 hours a day and direct supervision of each inmate at least once every 30 minutes.

and timely access to care at the Mercer County Jail constitutes deliberate indifference to the potentially serious medical needs of the pre-trial detainees and convicted prisoners alike in violation of the Eighth Amendment."

*Id.* at 1308.

Legislative enactments have clearly established respondents' duty to provide for inmates' health needs. "When any prisoner is sick the jailer shall see that he has adequate medical and dental attention and nursing, and so far as possible keep him separate from other prisoners." *W.Va. Code,* 7–8–2 [1985]. County commissions are also authorized under *W.Va.Code,* 7–8–7 [1967] to contract annually with physicians to provide medical care for jail inmates.

Respondents have agreed to keep medical records, including medical charts and physician's orders, and hold regular sick call. Respondents also submitted a letter from a local mental health agency offering services to those inmates screened by the jail staff or inmates who request "on-going therapy." However, respondents have not agreed to medically screen new inmates or specify that all diagnosis and treatment will be provided by persons with suitable health care training which as we noted in *Hickson, supra* 170 W.Va. at 738, 296 S.E.2d at 860 "makes a sick call rather nugatory." Despite the statutory authorization, respondents have failed to bring physicians, dentists, nurses and other health care providers into the jail to attend to inmates' physical and emotional needs.

#### 4. *Sanitation, lighting and ventilation:*

Relators describe the jail's plumbing as filthy and inoperable and the walls and floors as generally rusty and dirty. Respondents provide in their answer that the sinks and toilets have been re-enameled and the jail's interior completely re-painted and cleaned. Lighting, both artificial and natural, is generally inadequate, and the only source of ventilation is the few screenless windows on the second floor.

All artificial cell lighting is derived from unprotected incandescent bulbs which in-mates use by manually turning the bulbs on and off. The inside stairway to the jail is lighted in the same manner by a bulb which must be turned while straddling the stairwell and reaching overhead. Respondents answer that they are "seeking approval" for new wiring and lighting, but again fail to specify whose approval they are awaiting since respondents are the only officers with the statutory duty and authority to implement such changes.

"The failure to provide security quality lighting fixtures of sufficient illumination to permit detainees and convicted inmates to read without injury to their vision constitutes a danger to the health and security of pre-trial detainees and prisoners alike." *Dawson, supra* at 1288. The respondent sheriff is required to "keep the jail in a clean, sanitary and healthful condition," *W.Va.Code,* 7–8–2 [1985], and the respondent commission must keep the jail in "constant and adequate repair, and supplied with the necessary heat, light, furniture, record books, and janitor service," *W.Va. Code,* 7–3–2 [1980].

#### 5. *Diet and Exercise:*

Inmates have no outside exercise and indoor recreation is limited to a single set of barbells and the recent addition of a ping pong table by respondents. Relator's proposal that the yard behind the jail and a vacant area on the second floor could easily be converted into recreation areas was not addressed by respondents. It is clear that inmates are now denied any meaningful opportunity to have daily exercise.

The Court in *Dawson, supra* at 1298 made the following comment regarding the inadequate exercise available at the Mercer County jail:

> Undue restrictions on prisoner's opportunities for physical exercise may constitute cruel and unusual punishment in violation of the Eighth Amendment when they pose an unreasonable threat to the prisoner's physical and mental health. See *Clay v. Miller,* 626 F.2d 345, 347 (4th Cir.1980); *Kirby v. Blackledge,* 530 F.2d 583, 586 (4th Cir.1976); *Rhem v. Malcolm,* 507 F.2d 333, 337 (2d

Cir.1974), *enforced,* 377 F.Supp. 995 (S.D.N.Y.1974), *aff'd,* 527 F.2d 1041 (2d Cir.1975), *enforced,* 432 F.Supp. 769 (S.D.N.Y.1977).

In *Hickson, supra,* we held that the narrow walkway in front of the cells failed to meet inmates' needs for indoor exercise and noted also that· a suitable outdoor recreation area could be provided at minimal cost. This same opportunity to provide low cost outdoor recreation is apparently available to respondents.

*W.Va.Code,* 7–8–2a [1985] provides that county commissions "shall provide wholesome and sufficient food ... for all prisoners confined in the county jail." The county commission is also required to keep

> such other accounts and records as will enable it to show the per capità daily cost of the feeding and care of prisoners in each calendar month.
>
> ....
>
> (g) The county commission shall require to be kept a daily record of food served prisoners and, in all counties having a county health officer, said health officer shall, at least once a month, inspect such lists and make such recommendations and suggestions as he may deem proper regarding daily diets and foods regardless of how the feeding sources are provided.

*Id.*

. *W.Va.Code,* 7–1–5 [1980] states that "[i]t shall be the duty of the county commissioners ... to arrange for the feeding and care of the prisoners...."

In Doddridge County no records are kept of menus or cost per capita for food served the inmates nor are menus evaluated by a county health officer to determine the nutritional balance of the jail diet. Respondents have offered only to provide "records of nutrition." It is unclear whether respondent commissioners have thereby agreed to supply all of the information which is statutorily required.

In *Dawson, supra,* the court ruled that a deprivation of either diet or exercise, if sufficiently severe, may violate both de-

tainees and convicted inmates' right to protection from cruel and unusual punishment. We agree with the *Dawson* court and also believe that these factors are relevant under our totality of conditions analysis.

6. *Visitation:*

Currently, all inmates are restricted to one 15–minute visit a week which must occur between 1:00 p.m. and 8:00 p.m. on Tuesday. Conversation between inmate and visitor can only occur by speaking loudly through a metal grill located below a small thick glass window. Conferences between inmates and their attorneys often occur in the same location or in the jail office, insuring a lack of privacy and confidentiality. From their answer, the only improvement so far authorized by respondents has been to allow contact visitation with family members. However, the frequency and length of such visits were not detailed by respondent.

The limited visitation in the Pocahontas County Jail described in *Hickson, supra,* resembles the conditions at the Doddridge County Jail. In *Hickson,* we ordered "[a]s to those inmates who pose no substantial security threat, accessible visitation...." *Id.* at 860. The plan which was later adopted to implement our decision allowed one hour of visitation five times a week with visitation times available at least two hours per day seven days a week including at least two evenings.[7]

Likewise in *Dawson, supra,* the court found the Mercer County Jail's meager visitation opportunities inadequate. "Requiring prisoners to shout in order to be heard and to strain to see their visitors through barely translucent glass of minimal dimension finds no justification in a legitimate governmental objective." *Id.* at 1309. The court ordered the defendants to "submit a plan upgrading the visitation facilities and liberalizing the visitation opportunities at the Mercer County Jail," *supra* at 1309, but declined to find under the totality of conditions test that contact visitation was constitutionally mandated.

7. See n. 3, *supra.*

7. *Access to reading materials, legal books and educational or vocational programs:*

The Doddridge County Jail has no library, and inmates have no access to legal books and materials or educational, vocational or work release programs.

■ Inmates of county jails are guaranteed the same right of meaningful access to courts as other state prisoners under the due process clause of the Fourteenth Amendment. The availability of legal books, writing materials and stamps, telephone access to attorneys, notarial services, and legal assistance in preparing and filing legal papers have been held to be elements necessary to guarantee prisoners reasonable access to the courts. *Dawson, supra; Hickson, supra.* In *State ex rel. McCamic v. McCoy,* 166 W.Va. 572, 276 S.E.2d 534, 535 (1981), we stated that:

> In West Virginia, we have an explicit provision regarding access to our courts in Article III, Section 17 of our Constitution: 'The courts of this State shall be open and every person, for an injury done to him, in his person, property or reputation shall have remedy by due course of law....'

The court in *Dawson, supra,* while acknowledging the shorter duration of terms in county jails as distinguished from state prisons still ruled that jail inmates must be furnished "diverse periodicals and other reading materials" to combat the "undue risk of physical, mental and social degeneration." *Id.* at 1316.

In their answer, respondents have addressed only the issue of reading materials by stating that access to the local library for inmates is being investigated.

8. *Grievance procedure and written rules of conduct:*

Prior to the institution of this suit there were no written rules or regulations governing the conduct of either inmates or jail personnel nor was there a grievance proce-

dure by which inmates could challenge jail decisions. Likewise, no written policies defined inmates' rights and privileges.

■ In *State ex rel. Gillespie v. Kendrick,* 164 W.Va. 599, 265 S.E.2d 537 (1980), we commented for the first time on *W.Va.Code,* 7–8–11 [1986], which provides that all county jail inmates serving a term which exceeds six months shall have five days deducted from their sentences each month for complying with all rules and regulations of the respective jail. "County jail prisoners have the statutory right to good time credits and it is mandatory that they be granted their credits if they 'faithfully comply with all rules and regulations.' W.Va.Code, 7–8–11." Syl. pt. 1, *State ex rel. Gillespie v. Kendrick,* 164 W.Va. 599, 265 S.E.2d 537 (1980).[8] In this case which preceded *Dawson, supra,* and likewise dealt with the Mercer County jail, we held that the rules and regulations upon which good time credit is conditioned must be published and made available to inmates. "Good time credit is a valuable liberty interest protected by the due process clause, W.Va. Const. art. III § 10." Syl. pt. 2, *Gillespie, supra.*

Respondents represent that a jail handbook containing both rules and regulations and grievance procedures for inmates is being printed.

*Conclusion*

Respondents finally state that their ability to correct the acknowledged deficiencies is restricted by the county's lack of funds and request additional time for compliance. Courts have regarded economics as a significant concern for the effective management of jails and prisons, "[b]ut the cost of protecting a constitutional right cannot justify its total denial." *Bounds v. Smith,* 430 U.S. 817, 825, 97 S.Ct. 1491, 1496, 52 L.Ed.2d 72 (1977); *see, e.g., Dawson, supra.* We have also recognized that: "Once a state legitimately deprives a person of his liberty, it is required to shoulder the economic burden necessary to preserve the

---

**8.** In 1986, the legislature removed the provision granting inmates sentence reduction for donat-

ing blood; otherwise, the statute is unchanged.

constitutional rights retained by the person within the walls of the jail or prison." *Dawson, supra* at 1283. We note that one option respondents may consider, given the costs of needed improvements, is permanently closing the jail and transporting local inmates to other county jails.[9]

Based upon our review of the pleadings and exhibits in this case, we order that the Doddridge County Jail be closed until the facility meets the minimum constitutional and statutory standards. In the meantime, inmates shall be incarcerated at suitable facilities in adjoining counties.[10]

We are hopeful that the parties who have agreed on the nature of the multiple problems discussed above can also reach agreement on expeditious solutions. We therefore issue a moulded writ of mandamus directing respondents within 60 days from the filing of this opinion to submit to relator's counsel a detailed plan of improvements including a timetable for implementation. If an agreed plan cannot be implemented then any matters in dispute between the parties will be heard by the Honorable Jerry W. Cook, who is designated by this Court to sit as a Judge of the Circuit Court of Doddridge County.

Writ granted as moulded.

**9.** *See W.Va.Code,* 31–20–1, *et. seq.* [1985], the West Virginia Regional Jail and Prison Authority Act, which provides for the creation of multi-county jails. This type of facility would offer an alternative particularly for the smaller counties with low occupancy rates and insufficient county funds to maintain jails at the required minimum standards.

**10.** This does not preclude use of this jail for such purposes as visitation with families and friendly interviews with inmates' attorneys, and as a holding facility during court appearances.