508 S.E.2d 130

**STATE of West Virginia ex rel. WEST VIRGINIA REGIONAL JAIL AND CORRECTIONAL FACILITY AUTHORITY, Petitioner,**

v.

**WEST VIRGINIA INVESTMENT MANAGEMENT BOARD, Respondent.**

**No. 25134.**

Supreme Court of Appeals of West Virginia.

Submitted June 3, 1998.

Decided July 17, 1998.

Davis, C.J., dissented and filed opinion in which McCuskey, J., joined.

Benjamin L. Bailey, Esq., Special Assistant Attorney General, Kenneth E. Webb, Jr., Esq., Bowles Rice McDavid Graff & Love, Charleston, West Virginia, Attorneys for the Petitioner.

James K. Brown, Esq., Jackson & Kelly, Charleston, West Virginia, and Darrell V. McGraw, Jr., Esq., Attorney General, Silas B. Taylor, Managing Deputy Attorney General, Charleston, West Virginia, Attorneys for the Respondent.

MAYNARD, Justice:

In this original mandamus proceeding, the relator, the West Virginia Regional Jail and Correctional Facility Authority, requests that this Court evaluate the constitutionality of House Bill 4702 (1998),[1] a recent enactment of the West Virginia Legislature.[2] This bill directs the respondent, the West Virginia Investment Management Board, the group charged with investing the funds of the Public Employees Pension System, to invest $150,000,000 of the pension system funds in the West Virginia Jail and Correctional Facility Authority to enable it to complete the construction or renovation of certain jails and correctional facilities in West Virginia. The issues before us are, *inter alia*, whether House Bill 4702 constitutes an unconstitutional impairment of the contract existing between the State of West Virginia and the participants and beneficiaries of the Public Retirement System and whether House Bill

4702 violates Article X, Section 4 of the West Virginia Constitution which places limitations on the contracting of State debt.

## I.

### FACTS

The relator, the West Virginia Regional Jail and Correctional Facility Authority ("Jail Authority"), is a body corporate and governmental instrumentality created by the West Virginia Legislature. It is charged with the financing and construction of jails and correctional facilities in the State and is governed by the provisions of W.Va.Code § 31–20–1 to 31–20–28 as well as various constitutional provisions and decisions of this Court.

The respondent, the West Virginia Investment Management Board ("Board"), is also a body corporate and government instrumentality. It was created by the West Virginia Legislature to manage and invest the funds of West Virginia's various public employee pension systems. Its authority and powers to make investments are governed by the West Virginia Investment Management Act, W.Va.Code § 12–6–1 to 12–6–19, as well as by various constitutional provisions and decisions of this Court.

During the 1998 Legislative Session, the West Virginia Legislature passed House Bill 4702. The stated purpose of the bill is to finance the ongoing construction and renovation of jails and correctional facilities in West Virginia. The bill directs the Board, the body charged with managing the funds of the Public Employees Retirement System ("PERS"), to invest $150,000,000 of those funds in the Jail Authority for its on-going construction and renovation projects. The purpose of the investment is to enable the completion and construction of jail and correctional facilities. House Bill 4702 prescribes the source of the investment funds, establishes a method for repayment of the

---

**1.** House Bill 4702 (1998) was passed by the Legislature on March 21, 1998 and was effective from passage.

**2.** House Bill 4702 amends and adds to Chapter 12, Article 6 of the West Virginia Code which deals with the West Virginia Investment Manage-

ment Board. It amends and adds to Chapter 31, Article 20, the article dealing with the West Virginia Regional Jail and Correctional Facility Authority. Finally, it amends Chapter 33, Article 3, Sections 14, 15 and 17 of the W.Va.Code which deal with Licensing, Fees and Taxation of Insurers.

investment, and sets a market rate of interest.

Specifically, under the provisions of the bill, any PERS funds invested by the Investment Management Board with the Regional Jail Authority must earn an annual return equal to the five year average annualized rate of return earned by the core fixed-income portfolio of PERS, plus one tenth of one percent, and such rate of return shall not be less than five percent. The bill creates a "regional jail and correctional facility investment fund" in the State treasury that is dedicated to the payment of investment earnings and the return of PERS capital invested by the Board in .the Jail Authority. The regional jail and correctional facility investment fund will receive insurance taxes deposited in the "insurance tax fund," a special revenue fund made up of insurance taxes already established by W.Va.Code §§ 33–3–14 (1983) and 33–3–15 (1957). The bill further provides that monthly payments representing investment earnings and the return of PERS capital invested in the Jail Authority by the Board shall commence six months after funds are invested and cease within twenty-five years when all PERS capital is returned.

The Board has refused transfer of the $150,000,000 to the Jail Authority on the grounds that House Bill 4702 violates constitutional prohibitions against State impairment of contracts and the incurring of State debt. The Board also asserts that the bill raises other legal problems.

## II.

## STANDARD FOR GRANTING MANDAMUS

██ It is well-settled that,

[a] writ of mandamus will not issue unless three elements co-exist—(1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy.

Syllabus Point 2, *State ex rel. Kucera v. City of Wheeling*, 153 W.Va. 538, 170 S.E.2d 367

(1969). With this in mind, we now review the issues before us.

## III.

## DISCUSSION

### A.

*Issue No. 1: Impairment of Contracts*

The Board claims, first, that House Bill 4702 unconstitutionally impairs the contract between the State of West Virginia and the members and beneficiaries of the Public Employees Retirement System. According to the Board, House Bill 4702 results in the use of Public Employees Retirement System funds for purposes other than the sole benefit of the Public Employees Retirement System. We disagree.

██ Article III, Section 4 of the West Virginia Constitution states in part that "[n]o . . . law impairing the obligation of a contract, shall be passed." This is consistent with Article I, Section 10 of the United States Constitution which provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." To determine whether legislation impairs a contractual obligation in violation of the federal and state constitutions, this Court has stated the following three-pronged test:

The initial inquiry is whether the statute has substantially impaired the contractual rights of the parties. If a substantial impairment is shown, the second step of the test is to determine whether there is a significant and legitimate public purpose behind the legislation. Finally, if a legitimate public purpose is demonstrated, the court must determine whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption.

Syllabus Point 4, in part, *Shell v. Metropolitan Life Ins. Co.*, 181 W.Va. 16, 380 S.E.2d 183 (1989). Further, "[t]he severity of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual obligations may end the inquiry at its first stage." *Shell*, 181

W.Va. at 21, 380 S.E.2d at 188, *quoting Allied Structural Steel Co.*, 438 U.S. at 245, 98 S.Ct. at 2722–23, 57 L.Ed.2d at 736–37.

■ There is no doubt that a contract exists between PERS members and beneficiaries and the State. The Public Employees Retirement System was created by W.Va. Code §§ 5–10–1 *et seq.* in 1961 to provide a general retirement system for public employees. "A review of the statute reveals a classic example of a 'statutory' trust." *Dadisman v. Moore*, 181 W.Va. 779, 784, 384 S.E.2d 816, 821 (1988). Further, "[a] statute is treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature." *Id.*, 181 W.Va. at 789, 384 S.E.2d at 826, *citing United States Trust Co. v. New Jersey*, 431 U.S. 1, 17 n. 24, 97 S.Ct. 1505, 1519 n. 24, 52 L.Ed.2d 92 (1977). This Court has held that "[r]etired and active PERS plan participants have contractually vested property rights created by the pension statute, and such property rights are enforceable and cannot be impaired or diminished by the State." Syllabus Point 16, *Dadisman.* In order to ensure that the property rights of PERS participants are not impaired or diminished, this Court has stated, "The PERS Board, as trustee of retirement funds, must dispose of them according to the law. The board has a fiduciary duty to protect the fund and the interests of all beneficiaries thereof, and it must exercise due care, diligence, and skill in administering the trust." Syllabus Point 14, *Dadisman.* The essence of the contract between the State and PERS members and beneficiaries is that upon a member's retirement, he or she "shall receive a straight life annuity equal to two percent of his final average salary multiplied by the number of years, and fraction of a year, of his credited service in force at the time of his retirement." W.Va.Code § 5–10–22 (1971). Also, this Court has stated that "[t]he cynosure of an employee's *W.Va. Const.* art. III, § 4 contract right to a pension is not the employee's or even the government's contribution to the fund; rather, it is the government's promise to pay." Syllabus Point 12, *Booth v. Sims*, 193 W.Va. 323, 456 S.E.2d 167 (1995).

■ It is obvious, therefore, that not every modification to the State's existing contract with PERS members is a substantial impairment.

The realization and protection of public employees' pension property rights is a constitutional obligation of the State. The State cannot divest the plan participants of their rights except by due process, although prospective modifications which do not run afoul of the federal or State impairment clauses are possible.

Syllabus Point 18, *Dadisman.* Further, this Court has stated:

While the law recognizes that states retain some reserve power to modify by statute existing contractual pension relationships when the public interest so requires, such modifications must be reasonable and necessary to serve important public purposes. Legislative modifications to a pension plan must be reasonable, and the test for reasonableness is whether the alteration to the pension scheme serves to keep the system sound and flexible.

Syllabus Point 17, *Dadisman.* Legislative modifications have traditionally included amendments and additions to the list of investment vehicles available to PERS funds. *See* W.Va.Code § 5–10–38 (1961) and W.Va. Code § 12–6–9c (1997).

On September 27, 1997, the citizens of the State ratified the Modern Investment Management Amendment which amended Article X, § 6 of the West Virginia Constitution to read:

The credit of the state shall not be granted to, or in aid of any county, city, township, corporation or person; nor shall the state ever assume, or become responsible for the debts or liabilities of any county, city, township, corporation or person. The investment of state or public funds shall be subject to procedures and guidelines heretofore or hereafter established by the Legislature for the prudent investment of such funds.

This amendment is consistent with the Legislature's historical power to determine which body manages the investment of PERS funds and how these funds are to be invested. It

also appears to be a significant expansion of the Legislature's power to establish the procedures and guidelines for the investment of State monies, with the sole caveat being that these monies must be invested prudently.[3]

The history of the management of PERS funds reveals that the Modern Investment Management Amendment is simply an expansion of the authority already exercised by the Legislature in this area. This history also reveals the regularity with which modifications and amendments have been made to the system without violating the constitutional prohibition on the impairment of contracts. Over the years, the Legislature has passed legislation transferring investment duties for PERS funds from one State body to another and changing the types of investment vehicles available for PERS funds.

When PERS was initially created, the Board of Public Works was charged with investing the system's funds "in any securities or investments in which the sinking funds of the state may be legally invested, or in any securities or investments in which the deposits in savings banks and participation deposits in banks and trust companies may be legally invested." W.Va.Code § 5–10–38 (1961); *see Dadisman, supra.* W.Va.Code § 13–3–4 (1941) provided that sinking funds were to be invested in the following order: in the political division's own bonds; bonds issued by other political divisions of the State; bonds or treasury certificates of the United States government; or bonds of this State. Further, W.Va.Code § 5–10–38 provided that every state department or institution issuing any bonds was to make a written offer of these bonds to the Board of Public Works prior to advertising them for sale. The management of PERS funds was subsequently transferred to the Board of Investments which was authorized to invest, *inter alia,* in the direct and general obligations of the State. *See* W.Va.Code § 12–6–9(e) (1990). Now, the Investment Management Board manages PERS monies. The Modern Investment Management Amendment further modified the management of PERS funds by expanding the Legislature's power to establish investment guidelines and by increasing the kinds of permissible investments to include common stocks and corporate equities. Finally, in House Bill 4702, the Legislature has exercised its power to authorize the investment of PERS funds in the Jail Authority. This brief history indicates that technical or housekeeping alterations in the management of PERS funds, such as changes in the manager of the funds or an expansion in permissible investments, do not implicate the constitutional provision prohibiting the impairment of contracts. The contract between the State and PERS beneficiaries simply does not extend to such modifications.

The vital parts of the contract between PERS members and the State, rather, is not implicated so long as sufficient funds are provided and the promised pensions are paid. *See* Syllabus Point 12 of *Booth, supra.* To ensure that these obligations are met, the Legislature has provided numerous limitations and safeguards governing the investment of PERS funds. *See* W.Va.Code §§ 12–6–10 (1996) and 12–6–12 (1997). Upon considering the arguments before us, we are not persuaded that House Bill 4702 violates either of the terms mentioned above. The respondent here is challenging the Legislature's authority to expand the types of investments available to the respondent in its management of PERS funds. This challenge is couched in terms alleging an impairment of a contract. However, the contract between the State and PERS beneficiaries does not include an implied provision that the Legislature will not expand the number or kinds of investments available to the respondent, as long as the vital terms of the contract continue to be met.

▪ The respondent would have this Court assume the role of financial prognosticator and micro-manager of the PERS funds. This we decline to do. It is simply not our task to assess the financial worthiness of the provisions of House Bill 4702. Rather, such

---

**3.** The purpose of the Modern Investment Management Amendment, as stated by the Legislature, is "[t]o authorize the investment of state or public funds in common stocks and other equity investments and to further require the Legislature to establish guidelines and procedures for the prudent investment of such funds."

assessment belongs to the Legislature, and the Legislature has spoken. We presume that the Legislature has spoken in a constitutionally permissible manner.

In considering the constitutionality of a legislative enactment, courts must exercise due restraint, in recognition of the principle of the separation of powers in government among the judicial, legislative and executive branches. Every reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question. Courts are not concerned with questions relating to legislative policy. The general powers of the legislature, within constitutional limits, are almost plenary. In considering the constitutionality of an act of the legislature, the negation of legislative power must appear beyond reasonable doubt.

Syllabus Point 1, *State ex rel. Appalachian Power Co. v. Gainer,* 149 W.Va. 740, 143 S.E.2d 351 (1965). *See also* Syllabus Point 1, *West Virginia Trust Fund, Inc. v. Bailey,* 199 W.Va. 463, 485 S.E.2d 407 (1997). The respondent also argues that this investment in the Jail Authority is not permissible because it is not for the sole benefit of PERS. If we accepted this argument in this instance, however, it would effectively bar all investment of PERS funds.[4] PERS funds have always been invested in various ways without running afoul of the contractual provisions between the State and PERS beneficiaries. We conclude therefore, that House Bill 4702 does not constitute a substantial impairment to the contractual obligation of the State. The investment is of a limited amount, for a limited time, and to be repaid at an interest rate essentially equal to the rate on other already authorized investments. Accordingly, we find, for the above reasons, that House Bill 4702 (1998), which authorizes the investment of PERS monies in the Regional Jail and Correctional Facility Authority, does not

substantially impair the contract rights of PERS beneficiaries. We now proceed to the second issue.

### B.

*Issue No. 2: Contractual Limitation on the Contracting of State Debt*

Second, the respondents claim that House Bill 4702 violates Article X, Section 4 of the West Virginia Constitution which states:

No debt shall be contracted by this State, except to meet casual deficits in the revenue, to redeem a previous liability of the State, to suppress insurrection, repel invasion or defend the State in time of war; but the payment of any liability other than that for the ordinary expenses of the State, shall be equally distributed over a period of at least twenty years.

In *Winkler v. State School Bldg. Authority,* 189 W.Va. 748, 434 S.E.2d 420 (1993), this Court indicated that Article X, Section 4 does not preclude the State from issuing revenue bonds which are to be redeemed from a special fund under what is called the "special fund doctrine." In Syllabus Point 2 of *State ex rel. Marockie v. Wagoner,* 190 W.Va. 467, 438 S.E.2d 810 (1993), this Court explained the special fund doctrine as follows:

The Legislature may not designate funds that will be used to liquidate a revenue bond issue out of a current tax source that flows into the general revenue fund. If this practice were permitted, then a debt would be created that would burden the existing general revenue fund in violation of Section 4 of Article X of the West Virginia Constitution.

Although the relator argues that the provisions of House Bill 4702 fall under the special fund doctrine, we do not agree. As noted above, to repay the capital and to pay the earnings on the investment mandated by House Bill 4702, the insurance taxes already established by statute will be deposited in the insurance tax fund and ultimately trans-

---

4. We note that there is nothing in our existing law to prevent the Investment Management Board from investing PERS monies in the New York stock and bond markets where jail construction bonds from other states are sold. Accepting the respondent's argument would produce the anomalous result of leaving this state's jail facilities unfunded and neglected while PERS funds were used to build new jails in Texas, Indiana or any other state. Regardless of what we do in the instant case, PERS monies will be invested out of state.

ferred to the regional jail and correction facility investment fund. Previously, however, these same insurance taxes were paid into the State treasury for the benefit of the State fund. Therefore, according to *Marockie*, the Legislature has impermissibly designated funds to repay the capital and the earnings on the investment in the Jail Authority out of a current tax source that flows into the general revenue fund. Because this tax revenue is no longer available to the general fund, a debt is created that burdens the existing revenue fund in violation of Article X, Section 4. We do not believe, however, that this disposes of the issue before us.

This Court has defined the basic intent and purpose of Article X, Section 4 as prohibiting legislative acts which would bind subsequent legislatures to appropriate money in subsequent fiscal years. *See State ex rel. Hall v. Taylor*, 154 W.Va. 659, 178 S.E.2d 48 (1970), *overruled on other grounds, State ex rel. West Virginia Resource Recovery–Solid Waste Disposal Authority v. Gill*, 174 W.Va. 109, 323 S.E.2d 590 (1984). This purpose grew out of " 'the experience of the mother state with debts contracted by her,' of which the framers of our 1872 Constitution were aware and therefore 'provided that this state should not contract indebtedness, except in specified instances.' " *Winkler v. State School Bldg. Authority*, 189 W.Va. 748, 755–756, 434 S.E.2d 420, 427–428 (1993), *quoting Bates v. State Bridge Commission*, 109 W.Va. 186, 188, 189, 153 S.E. 305, 306–07 (1930) (footnote omitted). In Syllabus Point 5 of *State ex rel. Dyer v. Sims*, 134 W.Va. 278, 58 S.E.2d 766 (1950), *rev'd on other grounds*, 341 U.S. 22, 71 S.Ct. 557, 95 L.Ed. 713 (1951), this Court stated:

> Under Section 4, Article X, of the Constitution of this State, the Legislature is without power to create an obligation to appropriate funds, for a purpose not mentioned in said section, by future Legislatures. Such legislation, if otherwise valid,

would be void under said section, as creating a debt inhibited thereby.

As the Court later stated in *Winkler*, 189 W.Va. at 756, 434 S.E.2d at 428, however, "it seems clear that the Court did not literally mean that any contract entered into by a state agency that extended over more than one year was constitutionally infirm," and noted that "*Dyer* recognized that by creating state agencies, the Legislature was obligating itself, in a constitutionally permissible manner, to pay funds necessary for those agencies' operational expenses from future general revenue funds." Likewise, as noted in *Winkler*, this Court has approved lease payments used to retire revenue bonds issued for building construction in *State ex rel. State Bldg. Comm'n v. Moore*, 155 W.Va. 212, 184 S.E.2d 94 (1971); an energy supply contract entered into by West Virginia University in *State ex rel. West Virginia Resource Recovery–Solid Waste Disposal Authority v. Gill*, 174 W.Va. 109, 323 S.E.2d 590 (1984), *overruled on other grounds, Winkler, supra*; the issuance of industrial and commercial revenue bonds under W.Va.Code § 13–2C–1 such as in *State ex rel. Ohio County Comm'n v. Samol*, 165 W.Va. 714, 275 S.E.2d 2 (1980); and, finally, those debts allowed under the recently articulated special fund doctrine.

█ In the present case, the Legislature designated a specific source of revenue as a funding mechanism and limited the amount dedicated and transferred annually from that fund to the Jail Authority. This is in accord with its authority under the new investment amendment to establish guidelines and procedures for the prudent investment of State or public funds. Considering the great importance of constructing, renovating, and repairing jails and correctional centers so as to meet constitutional requirements for the housing of prisoners, we believe the built-in limitations contained in House Bill 4702 are in sufficient conformity with the requirements of Article X, Section 4, and override the narrow strictures of the special fund doctrine as articulated in *Marockie*.[5] There-

---

5. In Syllabus Point 2 of *Hickson v. Kellison,* 170 W.Va. 732, 296 S.E.2d 855 (1982), this Court stated, "Certain conditions of jail confinement may be so lacking in the area of adequate food, clothing, shelter, sanitation, medical care and personal safety as to constitute cruel and unusual punishment under the Eighth Amendment to the United States Constitution and Article III, Section 5 of the West Virginia Constitution." *See also* Syllabus Point 2, *Crain v. Bordenkircher,* 176 W.Va. 338, 342 S.E.2d 422 (1986); and Syllabus Point 2, *Facility Review Panel v. Holden,* 177

fore, we find that Syllabus Point 2 of *State ex rel. Marockie v. Wagoner*, 190 W.Va. 467, 438 S.E.2d 810 (1993), which holds the Legislature may not designate funds that will be used to liquidate a revenue bond issue out of a current tax source which flows into the general revenue fund, is overruled to the extent that it prevents the Legislature from exercising its power to prudently invest State or public funds pursuant to Article X, Section 6 of the West Virginia Constitution, the *Modern Investment Management Amendment.* Also, we find that House Bill 4702 does not violate the limitation on the contracting of State debt in Article X, Section 4 of the West Virginia Constitution.[6]

## C.

### *Issue No. 3: Deprivation of Property Rights Without Due Process*

▬▬▬ Third, the respondent claims that House Bill 4702 deprives PERS participants of their property rights in the PERS fund without due process of law.

> The Fourteenth Amendment is not an independent source of property rights. The due process clause protects only those property interests already acquired as a result of "existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."

W.Va. 703, 356 S.E.2d 457 (1987). Further, "[i]ndependent of any constitutional considerations there are statutory provisions in our State which reflect a legislative mandate that county jails be operated at certain minimal standards." Syllabus Point 3, *Hickson, supra*. This Court has recognized that "[o]nce a state legitimately deprives a person of his liberty, it is required to shoulder the economic burden necessary to preserve the constitutional rights retained by the person within the walls of the jail or prison." *Facility Review Panel*, 177 W.Va. at 709–710, 356 S.E.2d at 463–464, *quoting Dawson v. Kendrick*, 527 F.Supp. 1252, 1283 (S.D.W.Va.1981).

In addition, we note that one of the purposes of House Bill 4702 is also the renovation and improvement of existing facilities and the construction of new facilities for detained juveniles. In the recent case of *State ex rel. West Virginia Department of Health and Human Resources v. Frazier*, 198 W.Va. 678, 482 S.E.2d 663 (1996),

*Gotkin v. Miller*, 514 F.2d 125, 128 (2nd Cir.1975), *quoting*, in part, *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (citation omitted). It is undisputed that PERS participants have contractually vested property rights created by the pension statute. *See* Syllabus Point 16, *Dadisman*. In other words, beneficiaries have a vested right in receiving their pension benefits. They do not, however, have a vested right in controlling the investment policies of the respondent. This task, rather, is set by the Legislature and the Investment Management Board. Also, "[u]ntil funds are withdrawn and paid out to individual members of the Public Employees Retirement System, the state has a beneficial ownership interest in such funds[.]" Syllabus Point 3, in part, *State ex rel. Gainer v. West Virginia Bd. of Invest.*, 194 W.Va. 143, 459 S.E.2d 531 (1995). We find, therefore, that House Bill 4702 does not implicate the constitutional due process guarantees of PERS beneficiaries as long as the State continues to pay PERS beneficiaries.

## D.

### *Additional Issues*

▬▬▬ The respondent also avers that House Bill 4702 violates W.Va.Code § 12–6–11 concerning the fiduciary duty of the Board in making investments. We believe, however, that W.Va.Code § 12–6–11 must be read in light of the Modern Investment Amend-

this Court recognized the problems of limited funding and restricted space for specified types of juvenile housing, taking special note of the ever-present problem of no positions for status offenders.

6. We believe also that the provisions of House Bill 4702 do not violate the spirit of Article X, Section 4 of our Constitution. As noted above, the basic intent and purpose of Article X, Section 4 is to prohibit any legislative act which would bind subsequent legislatures to make appropriations from the general revenue fund in subsequent fiscal years. By creating a special fund in the form of the insurance tax fund from which to pay the return of PERS capital and investment earnings, subsequent legislatures are not bound to appropriate monies from the general revenue fund for this purpose. Therefore, the funding mechanism in House Bill 4702 accords with the purpose of Article X, Section 4.

ment to Article X, Section 6 of the West Virginia Constitution. When this is done, we find no conflict between House Bill 4702 and W.Va.Code § 12–6–11. Therefore, we find that this argument of the respondent is without merit. Concerning the respondent's other arguments, for the reasons stated above, we find that House Bill 4702 does not, on its face, mandate the violation of the West Virginia Management Board's fiduciary duty to PERS beneficiaries.[7] Also, because we find that the expansion of investment vehicles to include investment in the Jail Authority does not constitute a substantial impairment of the PERS contract, we believe that the involvement of PERS beneficiaries is not necessary for the adjudication of this action. Finally, because we believe the investment and transfer of funds by the Board to the Jail Authority is a non-discretionary ministerial duty established by the Legislature in its enactment of House Bill 4702, we find that mandamus lies to compel the action sought by the relator.

We find, therefore, for the reasons stated above, that there is no legal prohibition on the operation of House Bill 4702. Consequently, we believe the three elements necessary for the issuance of a writ of mandamus are present here. Accordingly, we grant the writ of mandamus sought by the relator.

Further, we deem it important to state the following. First, we grant the writ sought herein because we believe House Bill 4702 is simply another modification made by the Legislature to the statutorily prescribed investment vehicles available to the Investment Management Board in its management of PERS funds, and that nothing in our constitution prohibits this action. We believe that our holding is consistent, for the most part, with the history of the management of PERS funds, Legislative modifications governing this management, and this Court's previous holdings.

Second, absolutely nothing in this decision should be seen as a retreat from this Court's holdings in *Dadisman*. We believe that our decision here in no way conflicts with *Dadisman*. Rather, we wish to reiterate specifi-

cally the vested property rights in PERS plan participants created by the pension statute, the constitutional obligation of the State to protect these property rights, and the duty of the Investment Management Board to manage the PERS fund according to the highest fiduciary standards.

Third, the presence of the funding mechanism contained in House Bill 4702 is integral to our finding that the bill meets constitutional standards. It is imperative to the continued actuarial soundness of PERS funds that this funding mechanism operate as provided.

Finally, as stated above, it is vital that PERS remain on a sound actuarial basis and that the State continue to meet its obligation to pay beneficiaries. If either of these conditions are threatened, there is nothing to prevent the parties to the statutory contract created in PERS from bringing a cause of action for breach of fiduciary duty.

### IV.

### CONCLUSION

Accordingly, we grant the writ of mandamus sought by the relator.

Writ granted.

DAVIS, Chief Justice, dissenting:

In my judgment, the majority opinion in this case has diminished the constitutional prohibition against governmental impairment of contracts. I believe a proper analysis of the constitutional impairment of contract doctrine emphatically requires denying the writ prayed for in this case. The majority of this Court failed to apply the proper constitutional analysis. I am compelled, therefore, to respectfully dissent.

### I.

### UNDER THE CORRECT IMPAIRMENT OF CONTRACT ANALYSIS HB 4702 VIOLATES THE CONTRACT CLAUSE OF BOTH THE STATE AND FEDERAL CONSTITUTIONS

Article 3, § 4 of the state constitution provides that "[n]o ... law impairing the obli-

---

**7.** We note that the Investment Management Board fulfilled its fiduciary duty in this case by refusing to make the investment mandated by

House Bill 4702 in order to ascertain by judicial determination the legality of the investment.

gation of a contract, shall be passed." A similar prohibition against governmental impairment of contracts is found in the federal constitution.[1] The majority opinion correctly notes that we have adopted a three-step test to analyze whether legislation impairs a contract.[2] In syllabus point 4 of *Shell v. Metropolitan Life Ins. Co.*, 181 W.Va. 16, 380 S.E.2d 183 (1989), this Court set out that test as follows:

> In determining whether a Contract Clause violation has occurred, a three-step test is utilized. The initial inquiry is whether the statute has substantially impaired the contractual rights of the parties. If a substantial impairment is shown, the second step of the test is to determine whether there is a significant and legitimate public purpose behind the legislation. Finally, if a legitimate public purpose is demonstrated, the court must determine whether the adjustment is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption.

Although the majority opinion acknowledges that a three-step test exists for analyzing statutory impairment of contract claims, the majority side-steps the correct analysis at the first step of the test by consciously applying the wrong standard. The majority opinion quotes language from the opinion in *Shell*. *Shell* stated that a minimal contractual impairment does not rise to the level of "substantial" impairment, therefore " '[m]inimal alteration of contractual obligations may end the inquiry at its first stage.' " *Shell*, 181 W.Va. at 21, 380 S.E.2d at 188, quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245, 98 S.Ct. 2716, 2722–23, 57 L.Ed.2d 727, 737 (1978). With this partial statement of the law in hand, the majority concludes "that House Bill 4702 does not constitute a substantial impairment to the contractual obligation of the State. The investment is of a limited amount, for a limited time, and to be repaid at an interest rate essentially equal to the rate on other already authorized investments." (Opinion, at 420, 508 S.E.2d at 137.)

If the legal analysis under consideration was as simplistic as the majority asserts, I would be compelled to conclude that the majority decision is correct. However, the analysis is not that simple.

Under contract impairment analysis "substantial" has two dichotomous meanings. The initial determination is not, as the majority opinion conveniently assumes, a mere application of the substantial impairment test. The initial inquiry is a determination of whose contract is impaired by the legislation. This inquiry dictates the proper meaning to be applied to "substantial." In fact, the United States Supreme Court has been adamant in holding that "impairments of a State's own contracts would face more stringent examination under the Contract Clause than would laws regulating contractual relationships between private parties." *Allied Structural*, 438 U.S. at 244 n. 15, 98 S.Ct. at 2722 n. 15, 57 L.Ed.2d at 736 n. 15. Therefore, as correctly argued by the respondent and the amicus in this case, the threshold for establishing a "substantial" impairment when evaluating a government contract is lower than the threshold for establishing a "substantial" impairment when evaluating contractual relationships between private parties.

In relying on the decision in *Shell*, the majority opinion did exactly what *Allied Structural* states is constitutionally *improper*. *Shell* involved legislation that was alleged to have impaired a contract between two private parties. Thus, in that decision "substantial" meant applying the standard with lesser analytical scrutiny. Whereas, in the instant case, the legislation at issue impairs a contract between the State and private parties. Therefore, the lesser analytical standard applied in *Shell* is constitutionally improper for application in this case. Unfortunately, the majority opinion applied *Shell's* lesser analytical standard to a case constitutionally required to have a heightened stan-

---

1. Article I, § 10, Cl. 1 of the United States Constitution provides that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts."

2. The three-stepped test was developed in *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983).

dard of analytical scrutiny. By using the wrong standard, it was quite easy for the majority to reach the wrong conclusion. However, when one applies the constitutionally proper meaning to "substantial" one is unequivocally lead to the conclusion that HB 4702 violates the contract impairment provision of the state and federal constitutions.

### A.

### HB 4702 Substantially Impairs the Contractual Rights of PERS Beneficiaries and Members

The initial inquiry is whether the statute has substantially impaired the contractual rights of the parties. The majority opinion concedes that "[t]here is no doubt that a contract exists between PERS members and beneficiaries and the State." (Opinion, at 418, 508 S.E.2d at 135.) The majority opinion also has concluded that HB 4702 does, in fact, impair the contract between the parties; but, that the impairment is not substantial. I disagree.

Affidavits were submitted on behalf of two eminently qualified actuaries, both of whom cautioned that the proposed withdrawal of $150,000,000 from PERS assets would cause a funding shortfall. The affidavit of actuary Thomas J. Cavanaugh provided succinctly:

> The transfer of funds contemplated by House Bill 4702 ... constitutes, in actuarial effect, a shortfall in the required contributions equal to the amount of any funds so transferred, because the transfer is not for investment purposes, but rather constitutes a diversion of fund assets to meet obligations other than those of the Retirement System. Any such transfer would

... render the System actuarially unsound.

The affidavit of actuary Scott L. Dennison stated the following:

> The term "actuarially sound" when used to describe a retirement system or plan may be best defined to mean that the operation of the retirement plan is being conducted and may reasonably be expected to continue to be conducted in such a manner that the fund's current assets, plus anticipated contributions and investment earnings, are expected to be sufficient to provide all benefit payments and expenses of the fund at all future points in time.... Under this definition of actuarial soundness, it is my opinion that with the passage of House Bill 4702 the West Virginia Public Retirement System has been rendered actuarially unsound.

Mr. Dennison's affidavit also exposed the critical flaw in the proposed rate of return on the money removed from PERS. The net result of this error is that no one knows the actual rate of return.[3]

Finally, it was clearly articulated by the respondent and amicus that the transfer of PERS assets in this instance will cause the exact same problem that resulted from the improper transfer of PERS assets in *Dadisman v. Moore*, 181 W.Va. 779, 384 S.E.2d 816 (1988). Presently, the improper funding and the improper transferring of pension funds in the *Dadisman* case is currently in litigation in federal court in the matter styled *State of West Virginia v. United States Dep't of Health and Human Services*, No. 2:97–0295 (S.D.W.Va.). The subsequent litigation in-

---

**3.** Mr. Dennison's affidavit stated the following:

The Act requires "investment" WVPERS assets at a rate of return that is not well defined, since there are various ways to interpret "a rate equal to the annualized rate of return earned by the core fixed-income portfolio of the public employees retirement system over the previous five years." For example, the annual rate of return of WVPERS assets in fiscal 1995, determined with regard to the actual timing and amounts of contributions entering the trust fund and payments leaving it, was 12.93% on a market value basis, but only 6.62% on an amortized book value basis. Neither of these rates bear any simple relationship to rates of return for fiscal 1995 calculated by

the investment board managing WVPERS assets during that year, since their method of calculation does not take into account the actual timing and amounts of contributions entering the trust fund and payments leaving the fund. There are thus several possible ways to determine an average rate of return over a five-year period, each suited to a particular purpose. However, the Act does not specify whether market value, book value, or amortized book value should be used, whether the timing of fund transactions should be considered in the calculations, or whether a weighted or simple average of the nominal yield of each security held during the period should be used for the calculation.

volves a claim by the federal government that its contribution to PERS was improperly transferred for a use that was not permitted. That is the federal funds were to be used for PERS members and beneficiaries only. In the instant case it has been proffered without challenge, that the federal government will also challenge the transfer of its PERS contributions for use in building jails. It has been estimated that the diversion of funds in the instant case "would expose the State to a similar federal liability in the amount of $30 million." (Amicus Brief of the Attorney General, at 21.)

In view of the above evidence, the majority, using the incorrect standard for analyzing "substantial" impairment, concluded that there was no substantial impairment because "[t]he investment is of a limited amount, for a limited time, and to be repaid at an interest rate essentially equal to the rate on other already authorized investments." That conclusion by the majority is disingenuous. By utilizing the more stringent standard for "substantial" impairment that is required by *Allied Structural,* it is patently obvious that no person or entity knows the actual rate of return that a funding shortfall will create from the transfer; that the transfer is actuarially unsound so as to threaten future beneficiaries; and that a minimum unfunded liability of $30 million will most likely be due the federal government. In the final analysis, I believe the overwhelming evidence clearly demonstrated HB 4702 substantially impaired the contract between the State and PERS members and beneficiaries.

### B.

### A Significant and Legitimate Public Purpose Supports HB 4702

Demonstrating that the legislation at issue in this case substantially impairs the contract under consideration does not end the inquiry. If a substantial impairment is shown, the second step of the test is to determine whether there is a significant and legitimate public purpose behind the legislation.[4] I need not delay in resolving this second step. The record shows without question that a

significant and legitimate public purpose motivated HB 4702. The legislation in this case is aimed at increasing the number of regional jails in the State. The increase in regional jails would help with overcrowding and questionable living conditions that currently plague our correctional system. I believe that these are significant and legitimate public purposes.

### C.

### HB 4702 Is Not Reasonable Legislation

Finding that a significant and legitimate purpose supports HB 4702 takes us to the third step of our test.[5] If a legitimate public purpose is demonstrated, the court must then determine whether the adjustment is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption. This third test is a reasonableness test. The United States Supreme Court discussed this test in *United States Trust Co. v. New Jersey,* 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977):

> As with laws impairing the obligations of private contracts, an impairment may be constitutional if it is reasonable and necessary to serve an important public purpose. In applying this standard, however, complete deference to a legislative assessment of reasonableness ... is not appropriate because the State's self-interest is at stake. A governmental entity can always find a use for extra money, especially when taxes do not have to be raised. If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all.

*Id.,* 431 U.S. at 25–26, 97 S.Ct. at 1519, 52 L.Ed.2d at 112.

*United States Trust* clearly illustrates that courts are not to grant carte blanche deference to a legislative assessment of what is reasonable legislation. Reasonableness must filter through a more stringent analysis. The stringency requirement was articulated

---

4. The majority opinion never addressed the second step of the *Shell* test.

5. The majority opinion never addressed the third step of the *Shell* test.

in syllabus point 17 of *Dadisman.* In *Dadisman* the unanimous Court stated, in part, that "the test for reasonableness is whether the alteration to the pension scheme serves to keep the system sound and flexible." In view of *Dadisman,* I believe the amicus brief in this case is absolutely correct in stating that "[n]othing in the legislative history of the House Bill supports an inference that the proposed loan arose out of the need to maintain the flexibility or integrity of the pension plan; indeed, HB 4702 eliminates the trustees' flexibility to make prudent investments, and substantially impairs the actuarial integrity of the PERS." (Amicus Brief of the Attorney General, at 27.) All of the evidence in this matter shows that the legislature did not have the fiscal integrity of PERS assets in mind. In fact, the legislation took a route that is guaranteed to unsettle the financial well-being of PERS. Thus, I believe that HB 4702 is not based upon reasonable conditions and is not of a character appropriate to the public purpose justifying the legislation's adoption.

## II.

### CONCLUSION

In view of the foregoing, I believe HB 4702 violates the Contract Clause of both the state and federal constitutions. Therefore, I respectfully dissent. I am authorized to state that Justice McCuskey joins in this dissenting opinion.