STATE *ex rel.* JACK ALSOP

*v.*

JAMES R. MCCARTNEY, *Secretary of*
*State of West Virginia*

*and*

ALBERT L. SOMMERVILLE, JR.

(No. 13755)

Decided September 28, 1976.

*Morton & Garrett, William C. Garrett* for relator.

*Chauncey H. Browning,* Attorney General, *Cletus B. Hanley,* Deputy Attorney General, for respondents.

*Naaman J. Aldredge* for amicus curiae.

*Fred A. Jesser, III* for amicus curiae for Fayette County Bar Ass'n.

NEELY, JUSTICE:

This action in mandamus was brought to strike down the procedure used to nominate candidates for seven new judgeships created by the 1976 Amendment to *W. Va. Code,* 51-2-1.[1] We deny relief.

---

[1] In addition to creating seven new judgeships *W. Va. Code,* 51-2-1 made legislative provision for an eighth additional judgeship which had been judicially mandated for the thirteenth judicial circuit in the case of *State ex rel. Casey v. Pauley,* ___ W. Va. ___, 210 S.E.2d 649 (1974). The sections of *W. Va. Code,* 51-2-1 pertinent to this case are as follows:

"(b) The term of office of the additional circuit court judge of each of the following judicial circuits created and established by the provisions of subsection (a) of this section, viz., the seventh, twelfth, thirteenth, fourteenth, seventeenth, twenty-

On March 17, 1976, during the Regular Session of the West Virginia Lesiglature, the Legislature passed Senate Bill No. 322 adding judgeships to the 7th, 12th, 13th, 14th, 17th, 21st, 25th and 29th Judicial Circuits with eight year terms of office beginning on January 1, 1977. The bill contained a provision to extend the deadline for filing certificates of candidacy until March 30, 1976, because the drafters were aware that the regular deadline for filing would have passed by the time the bill was enacted; however, the vote to make the bill effective from passage, which required the concurrence of two-thirds of the members elected to each house of the Legislature, *West Virginia Constitution*, Art. VI, §30, failed, and as a result Senate Bill No. 322 became effective June 15, 1976, ninety days after its passage and well after the May 11th primary election.

---

first, twenty-fifth and twenty-ninth judicial circuits, shall commence on the first day of January, one thousand nine hundred seventy-seven, and shall end on the thirty-first day of December, one thousand nine hundred eighty-four.

(f) The election of every circuit court judge whose term of office begins on the first day of January, one thousand nine hundred seventy-seven, and ends on the thirty-first day of December, one thousand nine hundred eighty-four, shall be held on the Tuesday next after the first Monday in November, one thousand nine hundred seventy-six, and every eighth year thereafter. The election for all other circuit court judges shall be held on the Tuesday next after the first Monday in November, one thousand nine hundred eighty-four, and every eighth year thereafter.

Notwithstanding the provisions of article five [§3-5-1 *et seq.*], chapter three of this Code, and in order to provide for the orderly nomination and election of circuit court judges, the time permitted for the filing of certificates of candidacy for nomination to the additional circuit court judgeships created and established by the provisions of subsection (a) of this section, viz., the seventh, twelfth, thirteenth, fourteenth, seventeenth, twenty-first, twenty-fifth and twenty-ninth judicial circuits, is hereby extended to the thirtieth day of March, solely for the year one thousand nine hundred seventy-six. Such certificate shall be filed with the secretary of state or the clerk of the circuit court, as the case may be, not later than midnight, eastern standard time, of that day, or, if mailed, shall be postmarked before that hour."

Therefore, vacancies in the nominations for the additional judgeships could be filled only as general law provided at the time Senate Bill No. 322 became effective. It was determined by the Honorable J. C. Dillon, Jr., Chairman of the West Virginia State Democratic Executive Committee that the proper method for filling the vacancies in the nominations would be for Judicial Circuit Committees to meet in convention and select nominees, as provided in *W. Va. Code*, 3-10-3 (1967).[2]

On July 23, 1976 the 14th Judicial Circuit Committee met in convention, pursuant to a call by the duly appointed chairman and selected Mr. Albert L. Sommerville, Jr., as the Democratic nominee for the additional judgeship of the 14th Judicial Circuit. The committee

---

[2] *W. Va. Code* 3-10-3 (1967) provides, in pertinent part:

"Any vacancy occurring in the office of secretary of state, auditor, treasurer, attorney general, commissioner of agriculture, United States senator, judge of the supreme court of appeals, or in any office created or made elective, to be filled by the voters of the entire State, or judge of a circuit court, a common pleas, intermediate, criminal or other inferior court, shall be filled by the governor of the State by appointment. If the unexpired term of a judge of the supreme court of appeals, or a judge of the circuit court, a common pleas, intermediate, criminal or other inferior court, be for less than two years; or if the unexpired term of any other office named in this section be for a period of less than two years and six months, the apointment to fill the vacancy shall be for the unexpired term. If the unexpired term of any office be for a longer period than above specified, the appointment shall be until the next general election and until the election and qualification of a successor to the person appointed, at which election the vacancy shall be filled by election for the unexpired term. Proclamation of any election to fill an unexpired term shall be made by the governor of the State .... Candidates to fill any vacancy in any office named in this section shall be nominated in the manner provided in this article for nominating candidates to fill a vacancy in the office of governor, to be voted for at a general election, but in selecting candidates for the office of judge to serve in a single county, the county executive committee of the county shall perform the duties relating thereto, and, in selecting candidates for the office of judge of a circuit court in circuits embracing more than one county, the county executive committees of the counties concerned shall resolve themselves into a judicial circuit committee for discharge of the duties relating to such nominations."

noted the outcome of its convention in a duly certified resolution, which was transmitted to the respondent Secretary of State. Upon the respondent Secretary's receipt of both the resolution and Mr. Sommerville's filing fee, the Secretary wrote a letter to the chairman of the 14th Judicial Circuit Convention in which he signified his intent to accept Mr. Sommerville's nomination and to certify Mr. Sommerville's candidacy to the circuit clerks of the counties comprising the 14th Judicial Circuit.

On July 27, 1976 petitioner Jack Alsop filed his petition for a writ of mandamus in this Court, representing that he is a resident of Webster County, a registered voter of that county, a taxpayer of the State of West Virginia, and a resident of the 14th Judicial Circuit, which is composed of Braxton, Clay, Gilmer, and Webster Counties. Mr. Alsop described the manner in which respondent Sommerville was nominated for the additional 14th Circuit judgeship, and prayed that this Court enter an order requiring that the Secretary of State not certify Mr. Sommerville's nomination.

On September 7, 1976, the case was heard upon the petition, the memorandum in support of the petition, the briefs of petitioner and respondent McCartney, and the brief of Naaman J. Aldredge, *amicus curiae*. It became apparent to this Court that certain constitutional issues were not fully briefed and argued, and accordingly an order was entered requiring the parties to file supplemental briefs and to argue the case again on September 14, 1976. After reargument on that date the case was submitted for decision upon all of the original papers, together with the supplemental briefs of petitioner, respondent McCartney, Naaman J. Aldredge, and the brief of the Fayette County Bar Association, *amicus curiae*.

Originally the petitioner in this case limited his challenge to the question of whether a nomination may be made in the same way for a newly-created office as for an existing office that becomes vacant. He alleged that since there will be no additional 14th Circuit judgeship

until January 1977, there is currently no vacancy to be filled. Although the petitioner's challenge was limited, the Court perceived that any decision it made validating any aspect of the legislation under review or the procedure used to implement that legislation would be an impediment to future challenges and might have a chilling psychological effect on future litigation of other matters even if the formal requirements for the application of *res judicata* were not met. Consequently, the Court determined that it would address itself to this legislation only if all possible challenges to its validity were raised at the same time, and the Court demanded further argument and close scrutiny of the legislation.

I

Experience dictates that there are occasions on which courts must undertake something in the nature of advisory opinions. We have done this in cases involving elections because of the expense attendant upon campaigns and the deleterious effect on representative government which uncertainty in elections causes. *State ex rel. Maloney v. McCartney,* ____ W. Va. ____, 223 S.E.2d 607 (1976). Similarly we have rendered essentially advisory opinions when it was necessary to permit bond counsel to authorize the marketing of bonds for public authorities. *State ex rel. City of Charleston v. Coghill,* 156 W. Va. 877, 207 S.E.2d 113 (1973). The need for certainty before the investment of enormous amounts of human effort and before the investment of vast sums of money has led us to an *ad hoc* reappraisal of the common law requirement of a true adversary "case or controversy" as a condition precedent to court review.

Nonetheless, before this Court will undertake to adjudicate any matter directly affecting the public in general or groups, classes, and interests both unknown and unknowable, it must appear conclusively that every issue which could be raised in a proceeding to settle rights was raised 'and that those undertaking to perform the role of devil's advocate in a proceeding of this nature, which is in no way "adversary" in the conventional sense of a case or controversy, have pursued their task

with greater than average diligence and in the utmost good faith. In addition, in cases which are primarily concerned with a declaration of rights, the Court retains the prerogative to raise related issues on its own initiative and to demand as a condition precedent to a formal decision that the issues which it has raised be briefed and argued.

## II

In its present posture the challenge to Sommerville's nomination involves basically two issues. The first is whether Senate Bill No. 322 was effective in creating an opening for an additional 14th Circuit judge which can be filled at this fall's general election. The second issue is whether the bill can withstand constitutional attack for invidiously discriminating against independent candidates in the 1976 general election.

Petitioner's argument on the first issue is that no vacancy currently exists in the office of the additional 14th Circuit judgeship, since the term of office does not commence until January 1, 1977, as provided by Senate Bill No. 322. Therefore, it is argued, no action can be taken to fill the office until after December 31, 1976, when the vacancy in office will first occur. This argument finds some support in *W. Va. Code*, 3-10-3 (1967)[3] which establishes the procedures for filling vacancies in various state and federal offices, including circuit judgeships. *W. Va. Code*, 3-10-3 obviously contemplates a situation in which the vacancy to be filled is for an already existing office with a determinate unexpired term. By negative implication, then, petitioner reads *W. Va. Code*, 3-10-3 (1967) to say that an office must first be in existence before a vacancy in that office can be declared and filled. This reading of *W. Va. Code*, 3-10-3 might be accurate if that code section stood alone; however, Senate Bill No. 322 clearly provides for the newly created judgeships to be filled at the general election in November 1976:

---

[3]See footnote two above, for text of *Code* 3-10-3.

"The election of every circuit court judge whose term of office begins on the first day of January one thousand nine hundred seventy-seven, and ends on the thirty-first day of December, one thousand nine hundred eighty-four, shall be held on the Tuesday next after the first Monday in November, one thousand nine hundred seventy-six, and every eighth year thereafter." Senate Bill No. 322 as codified in *W. Va. Code*, 51-2-1(f) (1976).

This provision correlates perfectly with *W. Va. Code*, 3-1-18 (1965) which directs that newly created offices be filled at the general election before the term of office commences:

"If the legislature shall hereafter create any elective office, or make any office now filled by appointment an elective office, in the State or in any subdivision thereof, the person to fill the same shall be elected at the general election last preceding the beginning of the term of such office."

These provisions are clear and unambiguous; they will be applied and not construed. *Kucera v. City of Wheeling*, 153 W. Va. 531, 170 S.E.2d 217 (1969), *State ex rel. Dotson v. Van Meter*, 151 W. Va. 56, 150 S.E.2d 604 (1966). Taken together, these statutes indicate that for election purposes a vacancy now exists in the office of the additional 14th Circuit judge in anticipation of the January 1, 1977 commencement of the term of office.

### III

Having determined that Senate Bill No. 322 was effective in creating an opening for an additional 14th Circuit judgeship to be filled at the coming general election, the Court must now examine the procedure by which candidates for the newly created office are placed on the ballot. This raises the second major issue of the case: whether Senate Bill No. 322 as applied in the 1976 general election invidiously discriminates against independent candidates. Respondent Sommerville obtained his position on the ballot through the political party conven-

tion nominating procedure outlined in *W. Va. Code*, 3-10-3 (1967)[4]. The provisions of *W. Va. Code*, 3-10-3 do not, however, apply to independent candidates, nor to candidates of any political party polling less than 10% of the total vote cast for governor at the last preceding general election. Rather, such independent or splinter party candidates must qualify for ballot position in accordance with *W. Va. Code*, 3-5-23 and 3-5-24 (1963)[5], which together establish as the latest deadline for an independent's qualification the day preceding the date of the primary election. Since Senate Bill No. 322 did not take effect until June 15, 1976, it is clear that no independent candidate could have met this year's May 10th qualification deadline. Thus the cited statutes operate in this instance to prevent independent candidates from opposing

---

[4]*See*, footnote two above, for text of *Code* 3-10-3.

[5]*Code* 3-5-23 provides, in pertinent part:

"(a) Groups of citizens having no party organization may nominate candidates for public office otherwise than by conventions or primary elections. In such case, the candidate or candidates, jointly or severally, shall file a declaration containing the name of the political party he or they propose to represent, its platform, principles or purposes, with the secretary of state if the office is to be filled by the voters of more than one county, or with the clerk of the circuit court of the county if the office is to be filled by the voters of one county or political subdivision thereof; such declaration to be filed at least thirty days prior to the time of filing the certificate provided by section twenty-four [§3-5-24] of this article, and at the time of filing of such declaration each candidate shall pay the filing fee required by law, and if such declaration is not so filed or the filing fee so paid the certificate shall not be received by the secretary of state, or clerk of the circuit court, as the case may be . . . ."

*Code* 3-5-24 provides:

"All certificates nominating candidates for office under the preceding section [§3-5-23], including a candidate for the office of presidential elector, shall be filed, in the case of a candidate to be voted for by the voters of the entire State or by any subdivision thereof other than a single county, with the secretary of state, and in the case of all candidates for county and magisterial district offices, including all offices to be filled by the voters of a single county, with the clerk of the circuit court of the county, not later than the day preceding the date on which the primary election is held. After such date no such certificate shall be received by such officers."

respondent Sommerville in the general election, except by write-in vote which does not provide an adequate substitute for a ballot position.[6]

This Court does not wish to resolve this case by ruling simply that petitioner, who is not a potential independent candidate, lacks standing as petitioner sought to confess in his supplemental brief. Although the United States Supreme Court in *Simon v. Eastern Kentucky Welfare Rights Organization*, ___ U.S. ___, 44 L.W. 4724 (1976) signals retreat from broad rules of standing and invites our own withdrawal, we decline the invitation. In West Virginia the slippery doctrine of standing is not usually employed to avoid a frontal confrontation with an issue of legitimate public concern.[7]

In this case there is no reasonable allegation that *W. Va. Code*, 51-2-1 (1976) is unconstitutional; the only substantial allegation is that it will be unconstitutionally applied in the 1976 general election. The West Virginia Legislature determined that there is a need for seven new judgeships and it would be an unwarranted intrusion by this Court into the legitimate operation of the Legislature if we were unnecessarily to frustrate the legislative purpose by striking down this legislation unless there is no legitimate alternative. We perceive the correct rule to be that whenever this Court is called upon to interfere with the exercise of the powers of the other branches of government on constitutional

---

[6]*See, Williams v. Rhodes*, 393 U.S. 23, at 37 (1968) (Douglas, J., concurring): "Furthermore, even where operative, the write-ins are no substitute for a place on the ballot. To force a candidate to rely on write-ins is to burden him with disability."

[7]A line of West Virginia cases from *Pack v. Karnes*, 83 W. Va. 14, 97 S.E. 302 (1918) through the recent case of *State ex rel. Baker v. Bailey*, 152 W. Va. 400, 163 S.E.2d 873 (1968), recognizes the special public concern with insuring the regularity of elections and provides that citizens, taxpayers and voters have sufficient interest in such matters to bring actions in mandamus to compel election officials to discharge their duties in a lawful and proper manner.

grounds, and there are legitimate alternative remedies available, this Court should always adopt the least obtrusive remedy. All of the cases dealing with foreclosure of ballot access to independent candidates have provided the remedy of court mandated ballot access; they have never required that offices be removed from the election process nor have they foreclosed the rights of major party candidates placed on the ballot by existing statutory provisions.[8]

In the case *sub judice* the Court is persuaded that the objection to the application of *W. Va. Code*, 51-2-1 (1976) is purely speculative and theoretical, as no independent candidate has emerged to demand ballot access. We are particularly satisfied in this regard because all candidates for the position of circuit judge must be lawyers admitted to the bar for over five years, *West Virginia Constitution*, Art. 8 §7, and, consequently, there is only a small pool of possible candidates, all of whom may be presumed to know the law.

---

[8]*For example, Williams v. Rhodes*, 393 U.S. 23, (1968), the leading U.S. Supreme Court case in this area, shows that judicially mandated ballot access for independent candidates is the appropriate remedy when election laws accord party candidates more favorable treatment than independents. In *Williams* the Ohio American Independent Party, after failing to meet Ohio's rigorous requirements for third-party qualification on the ballot, went to court in an effort to obtain ballot positions for the party's presidential and vice presidential electors. The case reached the U.S. Supreme Court which, after close examination of Ohio's election laws, held that the laws imposed unconstitutional burdens on voting and associational rights in violation of the Equal Protection Clause. Accordingly, the Supreme Court ordered that the Ohio American Independent Party be permitted to have its name on the ballot along with the Democrat and Republican Parties. A three-judge Federal District Court granted this same remedy to the independent candidates who challenged South Carolina's election laws in *Torporek v. South Carolina State Election Com'n.*, 362 F.Supp. 613 (1973), an action brought under 42 U.S.C. 1983. Upon striking down the challenged laws as unconstitutional, the three-judge District Court entered an order directing that the names of the plaintiffs be placed on the general election ballot.

Had an independent candidate brought an action seeking ballot access before the last date on which a major political party candidate could have been certified to the respondent Secretary, this Court would have examined the need to place his name on the ballot. Although the petitioner has standing to bring this suit and have the issues resolved, under the doctrine of the least obtrusive remedy the Court could give affirmative relief only to an independent candidate. In a matter of this type the Court is called upon to further the entire intent of the Constitution. The doctrine of the least obtrusive remedy accomplishes this aim by guaranteeing to minorities their constitutional rights without disrupting the orderly administration of government on mere speculation.

*Writ denied.*