442

513 S.E.2d 669

STATE of West Virginia ex rel. WEST VIRGINIA DEPUTY SHERIFFS' AS-SOCIATION, INC., a West Virginia Corporation, Rodney A. Miller, Rick Woodyard, Pat Mull, K.C. Bohrer, David D. Gentry, Joseph C. Stiles, and Terry L. Miller, individually and as members of the Executive Board of the West Virginia Deputy Sheriffs' Association, Petitioners,

v.

James L. SIMS, Executive Secretary of the State of West Virginia Consolidated Public Retirement Board, David L. Wyant, Chairman; and the Honorable Cecil H. Underwood, Governor; Glen B. Gainer, III, Auditor; John D. Perdue, Treasurer; Joseph F. Markus, Cabinet Secretary; Carl A. Guthrie, Janet F. Wilson, James P. Quarles, Elizabeth Poundstone, Beatrice H. Gladwell and S.S. Satterfield, Members, Respondents.

No. 25212.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 8, 1998.

Decided Nov. 16, 1998.

John F. Dascoli, Esq., Andrew J. Katz, Esq., The Segal Law Firm, Charleston, West Virginia, Attorneys for Petitioners.

John R. Fowler, Esq., James C. Stebbins, Esq., Huddleston, Bolen, Beatty, Porter & Copen, Charleston, West Virginia, Attorneys for Respondents.

STARCHER, Justice:

In the instant case, we permit the transfer of employee pension funds to the new Deputy Sheriffs' Retirement Fund.

## I.

### Facts and Background

On March 14, 1998 the West Virginia Legislature passed House Bill 2415 ("HB 2415"), creating a new retirement system for deputy sheriffs. *Inter alia*, HB 2415 enacted *W.Va. Code*, 7–14D–1 to 7–14D–30, the West Virginia Deputy Sheriff Retirement System Act ("the Act"). The Act creates the West Virginia Deputy Sheriff Retirement Fund ("the Deputy Fund"), *W.Va.Code*, 7–14D–6 [1998].

Participation in the new deputy sheriff retirement system and the new Deputy Fund is mandatory for deputy sheriffs hired on or after July 1, 1998; transfer to the new system is optional for deputy sheriffs hired prior to July 1, 1998. *W.Va.Code*, 7–14D–5 [1998].[1] Retirement fund assets for deputies who choose to transfer, including employer and employee contributions, are to be transferred from the Consolidated Public Employees Retirement System ("PERS") trust fund established in *W.Va.Code*, 5–10–3 [1988] ("the PERS Fund") to the new Deputy Fund. *W.Va.Code*, 7–14–8 [1998].

The instant case arises because the Act requires the Consolidated Public Retirement Board ("the Board"), a public body established pursuant to *W.Va.Code*, 5–10D–1 [1998] that holds and is the trustee for both

---

1. The Act also requires that deputy sheriffs employed prior to July 1, 1998 receive a notice that "shall clearly and accurately explain the benefits, financial implications and consequences to a deputy sheriff of electing to participate" in the Deputy Sheriff Retirement Fund, "including the consequences and financial implications in re-gard to the benefits under the public employees insurance plan as set forth in article sixteen, chapter five of this code for those deputy sheriffs employed by a county which participates in that insurance plan." *W.Va.Code*, 7–14D–8a(a) [1998].

the PERS Fund and the new Deputy Fund, to:

> ... cause a judicial determination to be made regarding the transfer of assets from the public employees retirement system to the deputy sheriff's retirement system by causing a suit to be filed in the supreme court of this state seeking a writ of mandamus on or before the thirty-first of July, one thousand nine hundred ninety-eight.

W.Va.Code, § 7–14D–8(d) [1998].

The Act also requires the Board to:

> ... cause to be included in the judicial determination ... the issue regarding the possible loss of any rights in regard to benefits accorded the electing deputy under the West Virginia public employees insurance act, article sixteen, chapter five of this code, and whether a deputy sheriff, by electing to participate in the retirement plan created in this article, is being unlawfully discriminated against, or is being unlawfully deprived of a right of benefit to which he or she would otherwise be entitled.

W.Va.Code, § 7–14D–8a(b) [1998]. The title of this statutory section calls this "judicial determination" a "test case." *Id.*

Pursuant to the foregoing provisions of the Act, on May 14, 1998, James L. Sims, the executive secretary of the Board, advised the President of the West Virginia Deputy Sheriffs' Association that the Board would refuse to allow funds to be transferred from the PERS Fund to the Deputy Fund for any deputy sheriff employed prior to July 1, 1998. Mr. Sims stated:

> House Bill 2415 specifically requires that a writ of mandamus be filed with the West Virginia Supreme Court on or before July 31, 1998, which addresses and requires judicial determination of the above-mentioned legal issues. Consequently, and consistent with the statutory directive in this regard, the Consolidated Public Retirement Board has met today [May 14, 1998] and has passed a Resolution regarding this legislation, a copy of which is enclosed for your review. Pursuant to that Resolution, the Board will not proceed to transfer any assets from PERS to the new Deputy Sheriff's Retirement System

unless and until all legal and constitutional issues raised by the legislation have been judicially resolved.

Additionally, the Board is refusing to allow individuals hired prior to July 1, 1998 to be enrolled as members in the new Deputy Sheriff Retirement Fund.

As a result of this refusal by the Board to implement the provisions of the Act regarding the enrollment of and transfer of assets for deputies hired prior to July 1, 1998, the petitioners, the West Virginia Deputy Sheriffs' Association and several of its individual members, filed the instant petition for a writ of mandamus asking this Court to compel the respondents, the Board and its members, to comply with the pertinent provisions of the Act.

## II.

### Standard of Review

■ This is an original jurisdiction proceeding. Consequently, we are not directly reviewing a ruling or determination by a lower tribunal. Our standard for original mandamus jurisdiction has been recently stated as:

> " 'A writ of mandamus will not issue unless three elements coexist—(1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy.' Syllabus Point 2, *State ex rel. Kucera v. City of Wheeling,* 153 W.Va. 538, 170 S.E.2d 367 (1969)." Syllabus Point 1, *Smith v. West Virginia State Board of Education,* 170 W.Va. 593, 295 S.E.2d 680 (1982).

Syllabus Point 1, *State ex rel. Billy Ray C. v. Skaff,* 190 W.Va. 504, 438 S.E.2d 847 (1993).

## III.

### Discussion

Two issues are presented by the instant case. First, we face a procedural question: how should this Court respond to a "friendly lawsuit" or "test case" that essentially seeks an advisory opinion by this Court, and that is

brought as a result of a statutory directive that such a case be brought?

To this first question, our answer (in summary) is that we will respond cautiously and with an explicit *caveat* that in the future such statutory directives are legally questionable and disfavored.

The second issue we face is a substantive question: is there a legal basis for the PERS Board's refusal to implement the enrollment and asset transfer provisions of the Act? To this second question, our answer (in summary) is that, in the posture of the instant case, there is no legal basis (other than the statutory directive to cause a "test case" to be brought) for the Board's refusal to follow the requirements of the Act.

However, our ruling does not purport to consider all possible challenges to the Act. Additionally, our ruling is premised upon the Board's discharging its fiduciary duty relating to the PERS Fund and the new Deputy Fund.

## A.

### *Statutorily–Required Test Cases*

This is the second occasion within a year that the Legislature has included within a piece of legislation a statutory directive that a "test case" lawsuit should be brought to address constitutional and other legal issues arising out of the legislation's provisions.

The first occasion was in House Bill 4702 ("HB 4702"), also enacted in 1998. HB 4702 directed the West Virginia Investment Management Board to invest pension funds in the construction of state regional jails and correctional institutions. *See generally, State ex rel. W.Va. Regional Jail & Correctional Facility Authority v. W.Va. Investment Management Board*, 203 W.Va. 413, 508 S.E.2d 130 (1998).

As a part of HB 4702, new *W.Va.Code*, 12–6–21(f) [1998] directed that there be, as a "condition precedent " to any such investment of pension funds, "an action initiated in the West Virginia Supreme Court of Appeals regarding the [investment] ... and to otherwise determine the constitutionality of the provisions of Enrolled House Bill 4702...."

Pursuant to this statutory directive, a writ of mandamus was brought by the Regional Jail Authority against the Investment Management Board, asking this Court to require that the pension funds be invested as required by HB 4702. *Regional Jail, supra.* We granted the writ and approved of the loan, but we did not discuss the suit's origin in a statutory directive.

In the instant case, pursuant to a similar statutory directive, the PERS Board has refused to transfer the pre-July 1, 1998 deputy pension funds, in order to create a test case. The Investment Management Board had similarly refused to act in the *Regional Jail* case.

Both the provisions of *W.Va.Code*, 12–6–21(F) [1998] that gave rise to the *Regional Jail* opinion, and the provisions of *W.Va. Code*, 7–14D–8(d) [1998] that gave rise to the instant case, are legislative directives that this Court's opinion as to the constitutional or other legal acceptability of legislation be obtained by means of a "test case."

In both cases, the pleadings ostensibly pit a petitioner with an interest in the funds and statute in question against a respondent that will not comply with the mandate of the law. And in both cases, the respondent's unwillingness to comply with the law comes not out of conviction, but as the result of a statutory directive.

In both cases, the nominally adverse postures of the parties are a legal fiction used to create a case and a ruling by this Court on the legal acceptability of a piece of legislation—in other words, a classic "advisory opinion."

█ Generally and consistently, this Court has held that we are not a body that gives advisory legal opinions. "Courts are not constituted for the purpose of making advisory decrees or resolving academic disputes." Syllabus Point 2, in part, *Harshbarger v. Gainer*, 184 W.Va. 656, 403 S.E.2d 399 (1991).

Nevertheless, this general principle of not issuing advisory opinions has important exceptions, as we recognized in *State ex rel.*

*Alsop v. McCartney,* 159 W.Va. 829, 834–35, 228 S.E.2d 278, 281 (1976):

> Experience dictates that there are occasions on which courts must undertake something in the nature of advisory opinions. We have done this in cases involving elections because of the expense attendant upon campaigns and the deleterious effect on representative government which uncertainty in elections causes. *State ex rel. Maloney v. McCartney,* [159] W.Va. [513], 223 S.E.2d 607 (1976). Similarly we have rendered essentially advisory opinions when it was necessary to permit bond counsel to authorize the marketing of bonds for public authorities. *State ex rel. City of Charleston v. Coghill,* 156 W.Va. 877, 207 S.E.2d 113 (1973). The need for certainty before the investment of enormous amounts of human effort and before the investment of vast sums of money has led us to an *ad hoc* reappraisal of the common law requirement of a true adversary "case or controversy" as a condition precedent to court review.

> Nonetheless, before this Court will undertake to adjudicate any matter directly affecting the public in general or groups, classes, and interests both unknown and unknowable, it must appear conclusively that every issue which could be raised in a proceeding to settle rights was raised and that those undertaking to perform the role of devil's advocate in a proceeding of this nature, which is in no way "adversary" in the conventional sense of a case or controversy, have pursued their task with greater than average diligence and in the utmost good faith. In addition, in cases which are primarily concerned with a declaration of rights, the Court retains the prerogative to raise related issues on its own initiative and to demand as a condition precedent to a formal decision that the issues which it has raised be briefed and argued.

As *Alsop* recognizes, one problem with "friendly," or "test case" lawsuits is that the nominally adverse parties are not truly at each other's throats. The parties do not have the gut-level adversarial incentive that causes a litigant to bring forward all possibly meritorious arguments that might defeat their opponent's claims.

As a result, all of the potential issues may not get a zealous and full airing, and courts may be significantly handicapped in their deliberations and rulings. Recognizing this danger, we follow the principles set forth in *Alsop* and approach "friendly" lawsuits that essentially seek advisory opinions with caution.[2]

Additionally and importantly, neither *Alsop* (nor any other case that our research has found, in West Virginia or elsewhere) gives us guidance regarding cases where a legislature has directed in a statutory provision that an agency of government must take action—including refusal to comply with other duly enacted provisions of the law—so that a "test case" will result.

Without engaging in an extended discussion of the issue, a wide range of possible objections to and concerns about such directives come to mind. For example, could such directives violate the constitutional separation of powers,[3] insofar as the Legislature is attempting to direct the judiciary to rule on a case? Can the Legislature direct this Court when to apply and when not to apply the exception to the disfavoring of "advisory opinions" set forth in *Alsop, supra?* What would occur if this Court declined to accept such a case, or declined to rule on such a case after accepting it?

---

**2.** We have also recognized the propriety of declaratory judgment actions to obtain "anticipatory orders which adjudicate real controversies before violation or breach results in loss to one or the other of the persons involved." *Board of Educ. of Wyoming County v. Board of Public Works,* 144 W.Va. 593, 600, 109 S.E.2d 552, 556 (1959). Declaratory judgment may be used to determine the constitutionality of a statute. *Id.*

**3.** Article V, Section 1 of the *West Virginia Constitution* states:

> The legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others; nor shall any person exercise the powers of more than one of them at the same time, except that justices of the peace shall be eligible to the legislature.

■ We have recognized in exceptional circumstances that it may be this Court's proper role to entertain an occasional friendly, "test case" lawsuit—albeit cautiously. *Alsop, supra.* But given the apparent novelty in our jurisprudence of explicit statutory directives creating such lawsuits—and the arrival of two such novel lawsuits on this Court's doorstep in the last year—we conclude that this Court must attempt to speak firmly and clearly regarding statutory "test case" directives.

If we do not speak on this issue, what will prevent similar directives from being included in legislation regularly, whenever the Legislature has constitutional or other uncertainties about their enactments? At least at first blush, it appears to us that such a development would constitute an undesirable and probably impermissible alteration of our tri-partite constitutional scheme of government.

■ We hold, therefore, that statutory "judicial review" provisions—that make implementation of a statute contingent upon judicial construction, review, or approval of the statute; that attempt to mandate judicial construction, review or approval of a statute prior to its effectiveness; or that have the purpose of creating a "test case"—may violate the separation of powers doctrine contained in Article V, Section 1 of the *West Virginia Constitution.* Such statutory provisions are disfavored and courts are not obliged to accept and/or rule in proceedings that arise as a result of such provisions. In appropriate cases, such provisions, if they are unconstitutional or are otherwise legally impermissible, may be severed from the statutes in which the provisions are contained.

In the instant case (and in the *Regional Jail* case), the Legislature did not have the benefit of our position on the problems raised by such provisions. Having accepted the instant case, and seeing no compelling reason not to examine the substantive issues raised in the petition, we follow the approach of *Alsop* and cautiously examine the merits of this "test case."

## B.

### *Transfer of Funds*

The PERS Board asserts as its principal defense to the petitioner deputies' mandamus action that the Board does not know the financial consequences of transferring deputy sheriff retirement assets out of the PERS Fund and into the new Deputy Fund.

Therefore, the Board asks this Court to deny the writ of mandamus until the Board can conduct a study of the effects of the transfer. If there is no injury to the fiscal soundness of the rest of the PERS Fund, then PERS says it will not oppose the writ of mandamus.

However, if a study by the Board shows that the transfer of deputy sheriff funds out of the PERS Fund will threaten the actuarial solvency of the PERS Fund, then the Board says that it will oppose the transfer. The Board would base such opposition, it says, on the grounds that a transfer that threatens the PERS Fund's solvency would cause the Board to violate the Board's fiduciary duties to the beneficiaries of the PERS Fund.

The Board says that it has not performed such an "impact study" of the effect of the proposed transfer because the Legislature has not told the Board to do so, and because the Legislature has not "allowed the Board enough time" for such a study. (The Board does not suggest what would be enough time.)

In *Regional Jail, supra,* this Court recently recognized the fiduciary duty owed by the Board to the beneficiaries of the funds and assets that the Board holds in trust, 203 W.Va. at 418, 508 S.E.2d at 135 and we reaffirmed what we said about this fiduciary duty in *Dadisman v. Moore,* 181 W.Va. 779, 384 S.E.2d 816 (1988). *Id.*

We stated as follows in the syllabus of *Dadisman:*

The PERS Trustees have the highest fiduciary duty to maintain the terms of the trust ... The board has a fiduciary duty to protect the fund and the interests of all beneficiaries thereof, and it must exercise due care, diligence, and skill in administering the trust ... The Board ... has a

fiduciary relation with the PERS trust and participants and must invest employee earned pension system assets consistently with the highest standards of fiduciary duty.

Syllabus Points 5, 14, 25 (in part), *Dadisman, supra.*

It appears that the Board may believe that an affirmative order from the Legislature is necessary for the Board to evaluate the effect of the transfer of deputy sheriff retirement funds upon the fiscal and actuarial integrity and solvency of the other funds for which the Board is responsible.

However, our view is to the contrary. The fiduciary duty of the Board and its members that arises from the trust relationship with the beneficiaries of the assets in the Board's care encompasses the duty to monitor and evaluate the fiscal and actuarial soundness of the trust funds for which the Board is responsible.

In *Dadisman,* this Court used strong language in criticizing the Board's passive acquiescence for years to the underfunding of the PERS Fund:

> [W]hy didn't the [PERS] Board of Trustees come to this Court years ago as a Petitioner, rather than appearing now as a Respondent, culpable for the plunder of the funds placed in their trust?

181 W.Va. at 788 n. 12, 384 S.E.2d at 825 n. 12.

The affirmative duty of the Board to act today and in the future in an informed, proactive and independent manner to perform its fiduciary duty is no less now than it was when *Dadisman* was decided.

An evaluation of the objective fiscal consequences of HB 2415 is doubtless complex, and our jurisprudence correctly counsels that this Court should avoid a primary role in ascertaining the details of such matters. We are loath to "assume the role of financial prognosticator and micromanager...." *Regional Jail,* 203 W.Va. at 419, 508 S.E.2d at 136. That role belongs, ultimately, to the Board. Even without specific legislative direction, the Board has a duty to evaluate the effects of the new statutory scheme, and if necessary to act on the basis of that evaluation to protect the interests of the persons for whom the Board is the trustee.

If the Board finds that the creation of the new Deputy Fund will create actuarial or solvency problems, then the Board must immediately and forcefully inform the Legislature of the problems. If the Legislature does not take corrective action, then if necessary the Board must follow the route suggested in *Dadisman*—and use the court system to protect the rights of the beneficiaries of the funds held in trust by the Board.

■ Based on the foregoing reasoning, we hold that the fiduciary duty of the Consolidated Public Retirement Board established by *W.Va.Code,* 5–10D–1 [1998] and its members, with respect to the public employee pension funds and assets entrusted to board care, includes the affirmative duty to monitor and evaluate the effect of legislative actions that may affect such funds and assets, and to take all necessary actions, including initiating court proceedings if necessary, to protect the integrity and fiscal solvency of such funds.[4]

■ We further hold that the speculative possibility that the transfer of assets re-

---

**4.** One of the statutes that was involved in the *Regional Jail, supra,* case, was *W.Va.Code,* 12–6–21 [1998]. Subsection (g) of this statute, not addressed in the *Regional Jail* case, states:

> (g) The Legislature recognizes the fiduciary liability and responsibility imposed on the board by this article and by article six, chapter forty-four of this code. The board, its trustees and employees, have no liability, either personally or corporately with respect to the investment provided for in this section and the loans made under section nineteen of this article, if the investment and loans are made in accordance with the respective provisions of this section and section nineteen of this article.

While not deciding the issue (because it is not before us) we observe that reading this statutory language to equate the full performance of a pension fund trustee's duty with simply following a statutory directive would be of questionable constitutionality—on the grounds, *inter alia,* that such an equation would unconstitutionally eviscerate the independent duty and responsibility of the trustees of public employee pension funds, downgrading that duty to the mere slavish following of legislative fiat and impairing the primacy of the trustees' duty to the beneficiaries of the pension fund to see that their entitlements are protected. *See generally, Dadisman, supra.*

quired by *W.Va.Code*, 7–14D–8 [1998] from the public employees' retirement system ("PERS") trust fund to the deputy sheriffs' retirement fund established in *W.Va.Code*, 7–14D–6 [1998] may impair the fiscal solvency of the PERS trust fund does not bar the transfer of assets, where legal mechanisms exist that can detect and correct any impaired solvency in a timely fashion.

Because there is a mechanism within current law—the Board's performance of its fiduciary duty—that will (if properly followed) result in the correction of any actuarial or solvency problems caused by HB 2415 and thus prevent any unconstitutional or otherwise illegal impairment of the rights of the beneficiaries of the PERS Fund, there is no basis for this Court to stop the implementation of duly enacted HB 2415.[5]

Therefore, we grant the writ as moulded. The Respondents are required to implement the provisions of House Bill 2415. To the extent that the litigation in the instant case has interfered with any statutory deadlines established in House Bill 2415, those deadlines may be extended for an appropriate period to effect the statutory purpose. Additionally, the respondents are required to immediately conduct a full actuarial and solvency impact review of the effects of implementing House Bill 2415 and to act thereon in compliance with the principles set forth in this opinion. The Petitioners are entitled to be reimbursed by the Respondents for their attorney fees and costs incurred in prosecuting the instant case in this Court.

Writ Granted as Moulded.

5. The statutory directive at *W.Va.Code*, § 7–14D–8a(b) [1998] that there be judicial review of the provisions of HB 2415 states that the "judicial determination" should include the issues of:
> ... the possible loss of any rights in regard to benefits accorded the electing deputy ... and whether a deputy sheriff, by electing to participate in the retirement plan created in this article, is being unlawfully discriminated against, or is being unlawfully deprived of a right or benefit to which he or she would otherwise be entitled.

*Id.*

Although the respondents discuss these issues in their response to the mandamus petition, we decline to address these issues. If there are deputies who wish to raise these or other issues regarding the new retirement fund in the context

Chief Justice DAVIS, deeming herself disqualified, did not participate in the decision in this case.

of a less-friendly, more adversarial case, they are not foreclosed from doing so by our ruling in the instant case.

Nor does our ruling herein preclude subsequent legal action based on solvency issues arising out of HB 2415. We simply rule today that the respondents have not presented grounds in the instant case that will permit them to fail to obey the requirements of duly enacted legislation.

Finally, we also do not rule on another issue raised in the pleadings, the method of computation of the amount of funds to be transferred for each deputy. The parties are in apparent agreement on this issue. In any event, it appears to be a matter better suited to judicial attention (if necessary) in the first instance in a circuit court.